[No. S034072. May 18, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT ZANE CURL, Defendant and Appellant.

340

**COUNSEL**

Musawwir Spiegel, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson, Chief Assistant Attorney General, Mary Jo Graves, Assistant Attorney General, Eric L. Christoffersen, Jennifer M. Poe and Jennevee H. De Guzman, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**MORENO, J.**—Defendant Robert Zane Curl was convicted by a jury of the first degree murder of Richard Urban (Pen. Code, § 187, subd. (a))[1] as to which the jury found that defendant had personally fired one of the shots that caused Urban's death. The trial court then found true the special circumstance allegation that defendant had been previously convicted of second degree murder. (§ 190.2, subd. (a)(2).)[2] After a court trial, defendant was sentenced to death. This appeal is automatic. (Cal. Const., art. VI, § 11, subd. (a); § 1239, subd. (b).)

We affirm the judgment.

## I. FACTS

A. *Prosecution Guilt Phase Evidence*[3]

1. *Richard Urban's Disappearance on March 23, 1987*

On March 23, 1987, Duane Holt shared a residence with Nevallene Joanne (Nevi Jo) Holt Routh and her two teenage sons at the corner of Hughes and Hedges Avenues in Fresno.[4] Holt was a drug dealer and sold drugs out of his house. He and Nevi Jo were both methamphetamine or "crank" users. The Holt

---

[1] All further unspecified statutory references are to this code.

[2] The basis of the prior-murder special circumstance was defendant's 1977 conviction for the murder of Michael Conroy while defendant was incarcerated at the state prison at Vacaville. The trial court also found true allegations that defendant had suffered two prior convictions for assault with a deadly weapon and a third prior conviction for assault with a deadly weapon by a prisoner serving less than a life sentence (§ 4501). The prior convictions were struck by the court upon pronouncement of the death sentence.

[3] In setting forth this evidence, we apply the familiar appellate standard that, "[o]n appeal, we . . . construe the facts in the light most favorable to the judgment." (*Woodman Partners v. Sofa U Love* (2001) 94 Cal.App.4th 766, 771 [114 Cal.Rptr.2d 566].) We include this reminder because defendant's rendering of the facts highlights what he deems to be inconsistencies and credibility issues with respect to the prosecution's evidence and witnesses. But defendant's decision not to attack the judgment as unsupported by substantial evidence amounts to a concession that it is supported by such evidence. Even if he had made a sufficiency claim, it is black letter law that "[c]onflicts and even testimony which is subject to justifiable suspicion do not justify reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." (*People v. Maury* (2003) 30 Cal.4th 342, 403 [133 Cal.Rptr.2d 561, 68 P.3d 1].) In other words, the jury resolved these credibility issues against defendant and we are bound by that resolution. Accordingly, we set forth the evidence without defendant's extensive commentary regarding its reliability.

[4] The witness was referred to as "Nevi Jo" at trial and is referred to by that name for convenience. As she described it, her relationship with Holt was simply that they "just lived in the same house."

residence was also something of a gathering spot for young men who came and worked on cars in the yard. One of those young men was the victim, Richard Urban, who had previously purchased crank from Holt. Defendant and his girlfriend, Penny Baxter, were also frequent visitors to the Holt residence in March 1987, visiting almost every day. Like the others, defendant and Baxter were crank users.

On March 23, defendant and Baxter dropped in at the Holt residence three times. During their final visit, in the evening, Holt received a phone call that made him angry. After he hung up, he told defendant that "Rich" owed him $130 and that some people should be made an example of for not paying. According to Baxter, defendant told Holt, "You just have to do what you have to do." Holt said that "Rich was coming over." About 10 minutes after the phone conversation, Urban arrived in a van.

Holt asked Urban where his money was. Urban told him he did not have it because he had been kidnapped earlier that day. Instead, he offered Holt a set of rings in payment; the rings were gold and set with black onyx.[5] Holt refused but did accept some drugs from Urban, telling him, however, that he still owed him the money. At some point, Holt said he had to go down the street and he, Urban, and defendant left the house in defendant's truck. When defendant and Holt returned 35 to 40 minutes later, they were sweaty and jumpy. According to Randy Little, who was working on cars at Holt's house, they asked for a rope or a cable to start Urban's van. Eventually, they pushed it out of the yard. Defendant and Holt then went into the Holt residence. Baxter saw what she thought might be blood smeared on Holt's face; she remembered that Holt appeared to be nervous. Defendant and Holt went into a bedroom. They emerged a few minutes later, and then defendant and Baxter left.

As they drove home in defendant's truck, Baxter noticed a bag on the seat of the truck between defendant and her. She went to move it, but defendant told her to leave it alone. On the way to their residence, they stopped for food and cleaned the truck, including the floorboards and the bed of the truck. When Baxter and defendant arrived at their home, they took drugs and defendant listened to a police scanner. Baxter overheard a police report about a man who needed assistance and was bleeding from his head. Defendant appeared to be upset, and Baxter asked him what was wrong. He said a man had been shot and was bleeding from the head; the report, however, had not said anything about a shooting.[6]

---

[5] Richard Flanagan, a friend of Urban's, testified that Urban had come to his house around midnight on March 23 and tried to sell him the same rings.

[6] In Baxter's preliminary hearing testimony—which was read into the record during her trial testimony—she testified that defendant told her "the kid was shot three times," and that, after

Meanwhile Urban's "common law wife," Mardeau Hipp, had become concerned about Urban's whereabouts. Urban had left their house sometime after 8:30 p.m. in a van that Hipp's father had loaned her. She had last spoken to him sometime after midnight and asked him when he was going to be home. He told her 15 to 20 minutes. When he failed to come home, she started calling various people, including Holt, to see if Urban was with them. Hipp called Holt again the next morning, still trying to locate Urban, and spoke to Holt.

### 2. Events on the Days Following March 23

#### a. The Discovery of Urban's Body

On the morning of March 24, 1987, while delivering newspapers, Eusebio Duran saw a man's body off to the side of Dickinson Street between the road and a vineyard. The area surrounding the spot was agricultural and covered with vineyards. Duran delivered a few more papers and then made a U-turn and drove slowly past the body. The man was faceup, with his arms to his sides, and there was a large pool of blood around his head. Duran drove to a grocery store and called the police. He remained in the area until the police arrived, within three minutes of his call, and made a statement to them.

Pete Chavez, a detective with the Fresno County Sheriff's Department, arrived at the scene about 5:45 a.m. The weather was cold and wet as there had been rain a few days earlier. Chavez observed that the man's body was on its right side and there was blood beneath his head and upper body area. The man was clad in white pants, a tan jacket, and black tennis shoes. There were three sets of shoe prints around the body; these were photographed. When Chavez approached the body, he saw injuries to the head. In the man's right hand were car keys. The keys were later identified by Mardeau Hipp as belonging to the van she had borrowed from her father. The man was Richard Urban.

According to Jerry Nelson, the pathologist, the cause of death was gunshot wounds to Urban's brain, cerebrum and brain stem. Two bullets were recovered from the crime scene and sent to the prosecution's ballistics expert, Allen Boudreau. A third bullet was removed from Urban's skull and also examined by Boudreau. Pathologist Nelson concluded that two of the three gunshot wounds would likely have been fatal. He also concluded that two of the shots were fired from a distance of six to 12 inches from Urban's head. He could not determine

---

the scanner broadcast, defendant told her that "Rich" was on his knees when he was shot and had asked Holt, " 'How come this is happening?' "

the distance from which the third shot was fired, except to say that the gun had not been pressed against Urban's head. The pathologist believed that one of the shots was fired while Urban was lying on the ground, while another shot had been fired from above his head and in a downward direction. He could not determine either how many individuals had fired the shots or how many guns had been used. Based on his examination of the three bullets, Boudreau concluded that all were likely the same caliber, but he could not tell whether they had been fired from the same weapon.

b. *Urban's Van; Defendant's Conversation with Holt; Holt's Arrest*

About 7:40 a.m. on March 24, Kathleen Miller-Winn saw a van drive up and come to a stop in front of her house. She saw a man in his mid-20's to early 30's walking away from the van. The van was still parked in front of her house when she returned home from work that evening, and it remained there for about two days, until a neighbor called the police. The van was the vehicle that Urban had been driving on March 23.

The morning of March 24, Baxter and defendant went to Holt's residence. Holt began bragging to a man named Dane, who was also present, "about taking out somebody." Specifically, he said he had shot Urban. Defendant said, "you shouldn't talk about anything to anybody." Holt told defendant that maybe they should not be associated with each other, to which defendant replied, "Okay. Whatever." Later, as they drove home, Baxter asked defendant what was going on and what Holt had been talking about. Defendant told her not to ask any more questions about it. A day or two later defendant presented Baxter with the rings that Urban had offered to Holt the night he was killed. Defendant told her, "We'll fix them and use them for our wedding rings."[7]

On March 26, Holt and Nevi Jo were arrested on drug charges, and their residence was searched. Holt was charged with murder. Nevi Jo called Baxter and told her about Holt's arrest. Defendant was not present at the time, so Baxter told him about the arrest later. The next day he told Baxter he and Holt had taken Urban for a ride and were going to drop him off in the country to scare him.

3. *The Police Investigation*

a. *Footprint Impressions*

The footprint impressions photographed at the crime scene were analyzed by Frederick Hansen, an identification technician for the Fresno County

---

[7] Baxter, in turn, gave the rings to a man named Mark Bryant.

Sheriff's Department. Hansen testified that he found two categories of impressions, which he associated with a boot and a tennis or athletic shoe. He said that there was one pair of boots, or maybe more, at the crime scene. Holt wore cowboy boots. Urban was wearing tennis shoes when he was killed, but Hansen could not positively identify the tennis shoe prints at the scene of the crime as having been made by Urban's shoes.

### b. *Interviews with Baxter*

Baxter's name surfaced in the investigation on November 28, 1987. On December 1, 1987, she was interviewed by Detectives Pete Chavez and Frank Martinez of the Fresno County Sheriff's Department while she was in jail on petty theft and drug charges. She was interviewed a second time by Chavez, Martinez and Carla Riba, an investigator for the Fresno County District Attorney's Office. No promises were made to her at either interview. During the first interview, with Chavez and Martinez, Baxter told them about the rings that Urban had offered Holt as payment for the money he owed Holt for drugs. As a result, the detectives recovered the rings from Mark Bryant.

During the second interview, Baxter told Riba, among other things, that defendant described Urban's killing to her. She told Riba that defendant told her he and Holt forced Urban to get on his knees, that he pleaded for help, and that both Holt and defendant shot him. Baxter told Riba that defendant and Holt took "[Urban] out and they shot him three times in the head." Baxter said specifically that defendant shot the victim. Baxter also said that both defendant and Holt told her they had pushed a vehicle—presumably the victim's van—out of the yard.

### 4. *Defendant's Statements to David DeSoto*

In April 1987, David DeSoto, a four-time felon, was an inmate in the Los Angeles County jail on charges of burglary and assault with intent to commit rape; defendant was a fellow inmate.[8] DeSoto was interviewed by investigator Riba and Detective Martinez at the jail on May 5, 1988. Riba and Martinez had gone to the jail looking for a man named "Mark Conway," which was one of DeSoto's several aliases. They had come in response to DeSoto's calls to the Fresno County District Attorney's Office. DeSoto hoped

---

[8] Initially, the trial court issued an order prohibiting DeSoto and other witnesses from making reference to certain facts, including the fact that defendant had been in custody in Los Angeles, but the defense subsequently asked that this portion of the order be lifted as to DeSoto so that the defense could question him about the physical environment in which he overheard defendant's telephone calls.

that by providing information about defendant, he could get his bail reinstated, but it was not. He admitted that he had falsely attempted to make it appear to the investigators as if he had known defendant prior to April 1987. Neither Riba nor Martinez disclosed to DeSoto any reports of their investigation into Urban's murder or any details of the investigation. DeSoto told the investigators that the victim had been shot in the head and chest.

Subsequently, at trial, DeSoto testified that he had had a number of conversations with defendant in April 1987. According to DeSoto, defendant told him "he committed a murder" and "the guy that was with him got arrested behind him." Defendant told him the murder involved a person who owed money for drugs. The victim was a "youngster." DeSoto testified that defendant told him that "[t]he person he was with shot [the victim] twice. The guy didn't go down, or didn't die . . . so [defendant] said he had to do it to make sure he was dead." He said the victim was shot in the head and the chest. According to DeSoto, defendant told him that after the killing, the victim's body was wrapped up and left in a ditch near some fields. He also told DeSoto that the victim had been in possession of some jewelry, which he and Holt removed. He said defendant told him the victim was wearing "a blue western shirt."[9]

DeSoto testified that the other person involved was named "Smitty," and that defendant was concerned that Smitty "was gonna . . . tell on him or snitch on him behind it." DeSoto testified that defendant asked him to make a phone call to Smitty's girlfriend, Jo.[10] DeSoto made the call and told her he had a message from defendant for Holt "to hold his mug and not to say nothin' and . . . that he felt bad about" Holt's having been arrested.

B. *Defense Guilt Phase Evidence*

The defense presented evidence that a man named Steven Farmer, rather than defendant, had killed Urban. Penny Baxter testified that Farmer was present at the Holt residence the night Urban was killed and was wearing boots. A witness named David Grajiola testified that, while he and Holt were in custody together, Holt told him that he and Farmer had "booked someone's ass." Cliff Garoupa, a defense investigator for Duane Holt, testified that when he had visited Farmer in custody, after telling him that Grajiola had accused him of being involved in the Urban murder, Farmer told him to convey a message to a family member to "get rid" of a pair of boots.

---

[9] Urban was not wearing this kind of shirt when he was killed.

[10] Nevi Jo testified that after Holt was arrested, she received a call from DeSoto.

The defense also presented evidence that Holt alone had done the actual shooting of the victim. According to a witness named Vivian Moore, Holt had threatened a couple who owed him money for drugs that he had shot someone "and that he was not afraid to do it again."

## C. *Prosecution Penalty Phase Evidence*

The prosecution presented evidence that in December 1975, defendant stabbed a man named Craig Segal, who survived. In April 1977, while an inmate at the prison at Vacaville, defendant stabbed and killed a fellow inmate named Michael Conroy. Additionally, the prosecution presented evidence that, while incarcerated at the Fresno County Jail in this case, defendant and another inmate had attacked two other inmates as they were being escorted by correctional officers; the victims were in handcuffs and leg shackles. Defendant attempted to gouge out one of the victims' eyes. Finally, the prosecution presented evidence that in April 1987, after a routine traffic stop in Beverly Hills, defendant managed to gain control of the police car in which he had been placed in handcuffs and tried to run down the police officer who had made the stop.

## D. *Defense Penalty Phase Evidence*

The defense presented a social history of defendant through the testimony of Dr. Linda Poore. She testified that his early life was difficult because his parents were teenagers when he was born and too immature and inexperienced to be parents. Additionally, defendant was physically abused by his father, and both parents favored his brother, Stephen. She testified further that defendant attended academically poor schools. All of this, she concluded, made him vulnerable to bad influences, which led him into the juvenile justice system.

Defendant also presented witnesses who testified to his good character, including his former wife, Linda Curl. She testified that she had been a drug addict and a drug dealer before she married defendant. After they married, she was able to remain drug free and she, defendant, and her two children had a good family life together. Her two children, Chaela Ingles and Richard Upshaw, also testified on defendant's behalf; both of them considered defendant to be their father and spoke of his care and concern for them.

Linda Curl testified that defendant had had a positive work history until he suffered a severe injury to his left hand while working for a custom cabinetmaker. Defendant lost part of his fingers and, though they were sewn

back on, his manual dexterity remained impaired. As a result of his injury, defendant went on disability and became depressed. Eventually, he got work out of town and, away from his family, began using amphetamines because they deadened the pain and allowed him to continue working.

After defendant and Linda Curl divorced, she remained concerned about his well-being and asked her friend, Jeanette, to visit him. Eventually, Jeanette and defendant married while he was in custody, and she also testified on his behalf. She testified about her love for defendant and read the wedding vows he had composed for their wedding.

Numerous other witnesses, friends and family of defendant and Linda Curl, testified about his and Linda's happy family life and defendant's good character. A Catholic priest, Father Gary Luiz, testified to defendant's spiritual growth while in custody in this case and about his poetry. A literary editor also testified about defendant's poetry and opined that some of it was of high literary quality. Finally, defendant's former parole agent testified that defendant had successfully completed his one year of parole.

## II. DISCUSSION

### A. Challenge to the Constitutional Validity of Defendant's Prior Murder Conviction

■ Defendant contends that the prior-murder special-circumstance finding should be reversed because the constitutional validity of the underlying plea, which was the basis of the special circumstance allegation, was not proved beyond a reasonable doubt. In this connection, he contends that our earlier opinion in this case, *Curl v. Superior Court* (1990) 51 Cal.3d 1292 [276 Cal.Rptr. 49, 801 P.2d 292], in which we held that a defendant does not have a right to a jury trial on the constitutional validity of a prior conviction and bears the burden of proving such invalidity by a preponderance of the evidence, was superseded by *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348]. In *Apprendi*, the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (*Id.* at p. 490.) Two years later, in *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428], the Supreme Court held that Arizona's capital sentencing scheme ran afoul of the Sixth Amendment because it allowed the sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the death penalty. (*Ring, supra*, 536 U.S. at p. 609.) The court, citing language

from *Apprendi*, stated, "The dispositive question, we said, 'is one not of form, but of effect.' [Citation.] If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact—no matter how the State labels it—must be found by a jury beyond a reasonable doubt." (*Ring, supra,* 536 U.S. at p. 602.) Concluding that "Arizona's enumerated aggravating factors operate as 'the functional equivalent of an element of a greater offense,' [citation] the Sixth Amendment requires that they be found by a jury." (*Id.* at p. 609.)

As we shall explain, however, the question of the constitutional validity of a prior conviction does not fall within the framework set forth in *Apprendi* and *Ring* for those issues of fact as to which the Sixth Amendment requires a jury trial and proof beyond a reasonable doubt. Accordingly, we reject defendant's claim.

In 1977, defendant pled guilty to second degree murder, and that conviction became the basis of the sole special circumstance allegation in the instant case. (§ 190.2, subd. (a)(2) ["The defendant was convicted previously of murder in the first or second degree."].) "By pretrial motion defendant sought to strike the prior-murder special-circumstance allegation on grounds that he was under the influence of drugs at the time he pled guilty to the 1977 murder of an inmate at the California Medical Facility in Vacaville, and that he was not properly advised of his *Boykin-Tahl* rights (*Boykin* v. *Alabama* (1969) 395 U.S. 238 [23 L.Ed.2d 274, 89 S.Ct. 1709]; *In re Tahl* (1969) 1 Cal.3d 122 [81 Cal.Rptr. 577, 460 P.2d 449]) at the time he entered his guilty plea." (*Curl v. Superior Court, supra,* 51 Cal.3d at p. 1296.) Following a lengthy evidentiary hearing occasioned by the absence of a reporter's transcript of the 1977 plea, the trial court denied the motion. (*Id.* at pp. 1296–1299.)

Defendant filed a petition for writ of mandate that ultimately resulted in an opinion from this court, the aforecited *Curl v. Superior Court, supra,* 51 Cal.3d 1292. In *Curl*, we concluded (1) defendant's statutory right to a jury trial on the truth of the prior-murder special-circumstance allegation (§ 190.4, subd. (a)) did not encompass a jury trial on the constitutional validity of the underlying plea, and (2) defendant had the burden of proof in establishing the constitutional invalidity of the plea by a preponderance of the evidence. (51 Cal.3d at pp. 1300–1302, 1306–1307.) Following our decision, defendant renewed his attack on the validity of his plea, claiming that the first hearing had been conducted without the benefit of our decision. Another evidentiary hearing was held, at the conclusion of which the motion was again denied.

■ Defendant now asserts that, contrary to our conclusions in *Curl, Apprendi* and *Ring* require that the constitutional validity of his 1977 plea be relitigated before a jury and proved beyond a reasonable doubt. Not so. As noted, the right to a jury trial discussed in *Apprendi* and *Ring* applies only to an issue of fact "that increases the penalty for a crime beyond the prescribed statutory maximum" (*Apprendi v. New Jersey, supra,* 530 U.S. at p. 490), whatever its designation. Patently, the question of the constitutional validity of a prior conviction does not present such an issue of fact. As the Attorney General points out: "Finding that Curl was eligible for the death penalty was not contingent upon the finding that his prior murder conviction was constitutionally valid pursuant to *Boykin-Tahl.* Neither section 190.2, subdivision (a)(2) nor section 190.4 suggest such a requirement nor do these sections state that the constitutional validity of a prior murder conviction must be proved as an element of the offense prior to imposing the death penalty." A finding that the prior conviction is constitutionally valid does not in and of itself "expose the defendant to a greater punishment than that authorized by the jury's verdict." (*Apprendi, supra,* 530 U.S. at p. 494, fn. omitted.) The prosecution must still prove the special circumstance beyond a reasonable doubt to the trier of fact. (§ 190.4.)

Moreover, the constitutional validity of a prior conviction is an inquiry that our prior decisions, even those predating *Curl,* allocated to the trial court and not the jury. (*People v. Coffey* (1967) 67 Cal.2d 204, 217 [60 Cal.Rptr. 457, 430 P.2d 15] [first step of procedure to strike prior conviction is for the trial court to "hold a [pretrial] hearing outside the presence of the jury in order to determine the constitutional validity of the charged prior or priors"].) This is because the determination of the constitutional validity of a prior conviction is of a very different nature from the determination of whether the defendant suffered the prior conviction. "A prior conviction carries a ' "strong presumption of constitutional regularity," ' and the defendant must establish a violation of his or her rights that ' "so departed from constitutional requirements" ' as to justify striking the prior conviction." (*People v. Horton* (1995) 11 Cal.4th 1068, 1136 [47 Cal.Rptr.2d 516, 906 P.2d 478], italics omitted.) Given the presumptive constitutional validity of the prior conviction, a motion to strike "presents legal questions of a far different nature than the factual determination of the existence of the prior conviction" (*Curl v. Superior Court, supra,* 51 Cal.3d at p. 1303).

■ Accordingly, we conclude that neither *Apprendi* nor *Ring* superseded or implicitly overruled our decision in *Curl.* Therefore, contrary to defendant's argument, *Apprendi* did not represent an "intervening change in the law" that would bar applying the doctrine of the law of the case. (*People v. Stanley* (1995) 10 Cal.4th 764, 787 [42 Cal.Rptr.2d 543, 897 P.2d 481].)

Thus, our conclusion in *Curl*, that where a defendant challenges the constitutional validity of a plea the defendant must prove such invalidity by a preponderance of the evidence, remains the law of the case. Here, the trial court conducted a second hearing following our decision in *Curl* and denied the motion to strike. Because defendant does not challenge that proceeding, we assume the trial court correctly applied *Curl* and affirm its ruling.

## B. Guilt Phase Claims

### 1. Claims Related to the Testimony of David DeSoto

The bulk of defendant's guilt phase claims relate to the testimony of David DeSoto and fall into two broad categories.[11] The first—alleging prosecutorial and trial court misconduct—are based upon the alleged failure of the prosecutor to have turned over to the defense notes he made that memorialized conversations the prosecutor had with, and about, DeSoto prior to DeSoto's testimony at defendant's trial. The second claim alleges that the trial court erred by excluding impeachment evidence the defense wanted to use against DeSoto.

### 2. Claims of Prosecutorial and Trial Court Misconduct

Defendant asserts that DeSoto lied when he testified that "he had neither been promised, received nor expected any benefit in return for testifying and that any pre-trial communication he had with Mr. Hoff [the prosecutor] had solely concerned protection of his safety," because the prosecutor's "undisclosed" notes of telephone calls with and concerning DeSoto "would have revealed that DeSoto had in fact been impliedly assured by Hoff, and expected, that the testimony he gave would likely result in benefit to him with respect to charges pending against him." Thus, according to defendant, Hoff suborned DeSoto's perjured testimony to the extent DeSoto denied expecting or receiving any benefits for his testimony, and the trial court committed misconduct when, after reviewing Hoff's telephone notes in camera, it declined to provide them to the defense.

---

[11] Here, as elsewhere, defendant asserts constitutional violations he did not advance in the trial court. "[W]e . . . entertain constitutional claims not raised below only to the extent 'the new arguments do not invoke facts or legal standards different from those the trial court itself was asked to apply, but merely assert that the trial court's act or omission, insofar as wrong for the reasons actually presented to that court, had the additional *legal consequence* of violating the Constitution. . . . [¶] In [this] instance, of course, rejection, on the merits, of a claim that the trial court erred on the issue actually before that court necessarily leads to rejection of the newly applied constitutional "gloss" as well. No separate constitutional discussion is required in such cases, and we therefore provide none.' [Citation.]" (*People v. Richardson* (2008) 43 Cal.4th 959, 984, fn. 11 [77 Cal.Rptr.3d 163, 183 P.3d 1146].)

The existence of the prosecutor's telephone notes was revealed during a discussion of whether the prosecution had complied with discovery. Defense counsel requested that the prosecutor be ordered to search his records for evidence of benefits promised to Penny Baxter or DeSoto. Specifically, defense counsel alleged that "there's been an exchange of letters between the prosecution and Mr. DeSoto or—and/or the prison authorities to afford him certain reasonable benefits and accommodations. We would like to have copies of any of those letters to and from." The prosecutor responded that he had no knowledge of any letters with the Department of Corrections but that he had received phone calls from the department about DeSoto's status as a witness for purposes of classification and placement. Defense counsel then requested any record of telephone conversations. The prosecutor said he generally made notes of his telephone conversations and would search his files.

The following day, the prosecutor said he had spoken to someone in the Department of Corrections about whether DeSoto would be testifying and whether he would be in any danger if he did so. When defense counsel asked for a copy of the note memorializing that conversation, the prosecutor objected. The trial court sustained the objection on the grounds that "I don't think this document comes within the discovery order or the Penal Code statute, so I'm not going to order you to produce it." The prosecutor indicated he was still going through his records, and the court asked him to complete his search by the following day.

The next day the prosecutor brought in a file of 57 items, consisting of notes of his telephone conversations as well as letters he had written to prison or law enforcement personnel concerning DeSoto. He objected to turning over notes of his telephone conversations without a preliminary inspection by the trial court to determine whether they were discoverable. The file was designated exhibit C. The trial court reviewed the file as well as the transcript of the original discovery hearing before another judge and concluded that "I do not see where these notes would fall within any of the discovery orders that are provided in there or provided for in the Penal Code." In response to a defense counsel request that any exculpatory material in the notes be turned over pursuant to *Brady v. Maryland* (1963) 373 U.S. 83 [10 L.Ed.2d 215, 83 S.Ct. 1194], the trial court responded, "I have reviewed them with that in mind, and I found nothing in this file that would so qualify."

At trial, DeSoto conceded that his purpose in contacting the prosecution was to secure its help in the case for which he was in custody in Los Angeles County. He testified, however, that no promises of help were made to him by

either the district attorney's investigators or by the prosecution and that the investigators told him they had no jurisdiction over proceedings in a different county. With respect to his calls with Prosecutor Hoff, DeSoto testified that the purpose of those calls was not to secure a benefit in his Los Angeles case but, rather, "It [*sic*] would have been my safety."

■ "A prosecutor's misconduct violates the Fourteenth Amendment to the federal Constitution when it 'infects the trial with such unfairness as to make the conviction a denial of due process.' [Citations.] In other words, the misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.' [Citation.] A prosecutor's misconduct 'that does not render a criminal trial fundamentally unfair' violates California law 'only if it involves " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' [Citations.]" (*People v. Harrison* (2005) 35 Cal.4th 208, 242 [25 Cal.Rptr.3d 224, 106 P.3d 895].) " ' "Under well-established principles of due process, the prosecution cannot present evidence it knows is false and must correct any falsity of which it is aware in the evidence it presents . . . ." [Citation.]' " (*People v. Richardson, supra*, 43 Cal.4th at p. 1014.)

As the Attorney General points out, there is no perjury unless the challenged testimony was actually false. (§ 118, subd. (a).) Defendant fails to persuasively point to testimony by DeSoto that fits this description. Instead, his argument relies on a general claim that the "picture presented to the jury" about whether DeSoto received any benefits was false. According to defendant, the jury was led to believe that "although DeSoto had initially been induced to inform law enforcement of incriminating facts about [defendant] because of his wish to obtain bail and other benefits with respect to disposition of his pending charges in Long Beach, (1) he had been quickly disabused of any such hope, (2) the only benefit he received was protection from retaliation for his cooperation with law enforcement, (3) his testimony at [defendant's] trial was not influenced by any expectation of reward, other than a vague hope, and (4) the phone conversations that DeSoto had with prosecutor Hoff concerned nothing beside[s] his continued security in jail. [¶] That picture was false because neither Mr. Hoff nor the trial judge disclosed to the defense or the jury that DeSoto had lied about the nature of his phone calls with Hoff and whether, notwithstanding [the district attorney's investigators] telling him that he would get no benefit with respect [to] cooperating, DeSoto had consistently demonstrated his expectation of reward if his testimony was useful to the prosecution and been assured that his cooperation would be made known to authorities in Long Beach, where his case was pending. This deception was especially egregious since prosecutor Hoff,

having been a party to those phone calls, knew that it was false and deliberately suborned the perjurious testimony."

Defendant attempts to support this claim with an extensive analysis of the prosecutor's notes of his telephone calls to and about DeSoto. We have reviewed the prosecutor's notes and letters and find defendant's analysis utterly unconvincing. There are four letters from Prosecutor Hoff in exhibit C. The first two letters, both dated December 5, 1989, are addressed respectively to a correctional counselor at the state prison at Chino and to DeSoto himself. They were apparently written in response to a letter to Hoff from DeSoto in November 1989 in which DeSoto expressed concern for his safety should he testify and asked Hoff "to confirm his status" as a witness with prison officials. Hoff's letter to the correctional counselor confirmed that DeSoto would be called as a witness in defendant's trial and, in view of possible threats to his safety from defendant, stated his belief that "DeSoto's welfare and safety may be in danger. Therefore, I request that you consider this information in the classification and placement of Mr. DeSoto in your institution." His letter to DeSoto simply confirmed that he had talked to officials at Chino regarding DeSoto's classification and placement.

Another letter, dated April 2, 1990, to a correctional counselor at Corcoran state prison similarly informed the counselor that DeSoto had cooperated with law enforcement in defendant's case, expressed concern for his safety, and supported DeSoto's request to be transferred to another facility. The letter was written in response to a letter from DeSoto reporting a confrontation with other inmates over his role in defendant's prosecution.

The fourth letter, undated, is addressed to the deputy district attorney in charge of DeSoto's case in Los Angeles County at Long Beach. In it, Hoff stated that DeSoto provided information in the Curl case that had been corroborated and had agreed to testify. Hoff went on: "He has never requested nor has he received any promises in exchange for his information other than a promise from me that I would notify, in writing, the Los Angeles District Attorney's office, his attorney and/or the Court that he has cooperated with Fresno authorities in the Curl case. [¶] I believe Mr. [DeSoto's] past and anticipated future cooperation should be considered by your office in assessing his own criminal prosecution, and I ask you to give whatever weight you deem is appropriate to this matter."

Hoff's notes confirm the information in the letters: many of his conversations with DeSoto revolved around DeSoto's concern for his safety because of his cooperation in defendant's prosecution and, notwithstanding DeSoto's

attempts to secure some benefit from that cooperation, the only guarantee Hoff made was that he would inform the Los Angeles County District Attorney's Office of DeSoto's cooperation. For example, in a note dated May 26, 1988, Hoff stated: "I am making no deals w/[DeSoto] except to convey to L.A.D.A. that [DeSoto] appears to be giving truthful info and said he would cooperate and testify. [¶] I asked DeLong [the Los Angeles prosecutor] to handle his case on its merits w/o consideration of my use of [DeSoto] as a witness . . . ." In a note dated June 1, 1988, Hoff records a conversation with DeSoto in which DeSoto asked for help with getting a continuance and bail reduction and Hoff told him, "I could not control that matter." Hoff notes he called the Los Angeles prosecutor, did not reach him, but was later informed that DeSoto's case had been continued and bail remained the same.

In a note dated November 11, 1988, Hoff recorded that he had spoken to the Los Angeles prosecutor about his intention to use DeSoto as a witness "and that there is no deal/consideration being extended to [DeSoto] in exchange for his testimony" and "DeLong can deal w/[DeSoto's] case on its merits." To the same effect were notations on November 18, 1988, November 28, 1988, February 17, 1989, May 22, 1989, June 6, 1989, and June 21, 1989. Each note confirms that Hoff made no promise or inducement to DeSoto for his testimony except that he would inform the Los Angeles County District Attorney's Office of DeSoto's cooperation.

█ This record does not support defendant's claim that DeSoto perjured himself when he testified that he had not received any benefits in exchange for his testimony, much less that Hoff suborned perjury. Defendant maintains that the facts that DeSoto received a reduced sentence on the Los Angeles charges and that the sexual assault charge was dismissed are evidence that he lied about not having received any benefit for his testimony at defendant's trial. But there is nothing in the record before us that supports his claim that Prosecutor Hoff engineered the reduction in the sentence and the dismissal of the charge. The record is to the contrary—Hoff's notes consistently demonstrate that he did not offer DeSoto any inducements or benefits for his testimony.[12] Nor do we agree with defendant that DeSoto perjured himself when, in response to being asked about his telephone conversations with Hoff, he said. they involved his "safety."[13] Defendant claims this was misleading because DeSoto left out the fact that he had sought assistance with bail reduction and a continuance from Hoff, leaving the impression that

---

[12] Defendant insinuates that Hoff's references to the absence of any deal with DeSoto for his testimony is actually evidence that there was a deal and Hoff was creating "a paper record just in case his notes were ever discovered by the defense." At this point, defendant's legal analysis devolves into a conspiracy theory.

[13] Defense counsel objected to DeSoto's answer as nonresponsive. The objection was sustained and the answer stricken. We assume the jury understood and followed the court's directive to disregard the testimony. (*People v. Mickey* (1991) 54 Cal.3d 612, 689, fn. 17 [286

his safety was the only topic of discussion. We do not read the record in so narrow a fashion; moreover, the jury learned from cross-examination that DeSoto had sought other benefits in exchange for his testimony.

Accordingly, we reject defendant's claim of prosecutorial misconduct.

Defendant also asserts the trial court committed misconduct, apparently because the trial court declined to furnish Hoff's notes to the defense at trial after determining the notes were not discoverable pursuant to either the discovery order in this case or section 1054.1. On this record, we find no abuse of discretion. (See *People v. Ayala* (2000) 23 Cal.4th 225, 299 [96 Cal.Rptr.2d 682, 1 P.3d 3] ["We generally review a trial court's ruling on matters regarding discovery under an abuse of discretion standard."].) A fortiori, we find no misconduct.

### 3. *Claims of Evidentiary Error*

#### a. *Expert Witness*

Defendant contends that the trial court abused its discretion when it denied his request to call Raymond Stevens, a private investigator, as an "expert to explain how an inmate informant can obtain information used to concoct a confession that was never made." Defendant contends that this testimony would have been relevant to show how David DeSoto "could assemble information about the accusations against [defendant] in order to create a fictitious confession . . . ." Defendant specifically disavows any claim that he sought to have Stevens's testimony introduced to have Stevens render an opinion about DeSoto's credibility under Evidence Code section 801. Rather, he argues the evidence was admissible under Evidence Code section 720, which defines the qualifications of an expert witness. Defendant contends that the latter statute would have permitted Stevens to testify to "the procedure [in the Los Angeles County jail] whereby inmates can gain information about cases which the inmate believes the prosecutors would be willing to offer to the inmate . . . and that the procedures are such that the inmate can find out the foundational information without in fact having a conversation with a particular individual" and from which the informant can cobble together a fictitious confession. After an extended colloquy, the trial court denied the request "on grounds of relevancy, speculation, Evidence Code section 801. It invades the province of the jury under Evidence Code section 780. It calls for inadmissible lay opinion testimony."[14] We find no abuse of discretion.

---

Cal.Rptr. 801, 818 P.2d 84].) Therefore, even if we were to assume that DeSoto's answer was misleading, it played no part in the jury's assessment of his credibility.

[14] The Attorney General contends that defendant forfeited the argument he makes on appeal because he did not specifically refer to Evidence Code section 720. Not so. Defendant

At trial, defendant sought to admit the testimony of Raymond Stevens. Stevens was a 24-and-a-half year veteran of the Ventura County Sheriff's Department before becoming a private investigator who worked on contract with the State Public Defender's Office. After the trial court sustained prosecution objections to questions about whether Stevens had dealt with inmate informants, a hearing was held outside the presence of the jury in which the defense made an offer of proof as to Stevens's testimony. Characterizing DeSoto as an "inmate informant," defense counsel stated that Stevens had "qualified as an expert to render testimony about inmate informants, the process, the methods of selecting, evaluating and determining the truthfulness of their representations" and would render "his opinion regarding the validity of Mr. DeSoto in his role of an inmate informant." In this connection, defense counsel argued that sections of the Penal Code that singled out inmate informants recognized them "as a special breed of persons and witness [*sic*]." Initially, the defense cited Evidence Code section 801—permitting expert opinion testimony—as the basis of its request.

The prosecution objected on the grounds that there was insufficient foundation for the characterization of DeSoto as a long-term-inmate informant, that there was insufficient foundation that the subject of inmate informants was a matter for expert testimony, that the proposed testimony was neither material nor relevant, and that the proposed testimony would invade the jury's province as the sole evaluator of witness credibility. The trial court agreed that there was no support for permitting expert testimony on the subject of a witness's credibility. At that point, the defense backed away from its offer of proof, claiming it was not offering Stevens as an expert on whether DeSoto was being truthful, "but about the processes that were operative in L.A. County [jail] which would have been operative in the utilization of Mr. DeSoto as an inmate informant in this case . . . ."

Pressed by the court for specifics, the defense said that Stevens would testify "that there's a regular flow of information in and about the area, how they gather it without talking with the person. The only prerequisite that a person who wants to be an inmate informant really has is to be able to show at some point . . . being in the physical presence of another person." According to the defense, the inmate informant "gets that information by the flow of prisoners in and out of his environment, the use of the media, discussions with other people, phone calls to law enforcement officers," and that law enforcement should use "safeguards" to avoid false testimony by inmate informants. Asked by the court whether Stevens's testimony was, in

advanced the substantive claim he repeats here—that admission of Stevens's testimony was not for his opinion of DeSoto's credibility but to lay out the "procedure" by which inmate informants gather evidence to concoct false confessions. It is immaterial for purposes of preserving the objection that he did not specify the precise code section when he made clear the substance, purpose and relevance of the excluded evidence. (Evid. Code, § 354, subd. (a).)

effect, "a criticism of the law enforcement conduct in interviewing and accepting Mr. DeSoto's statements" without applying such safeguards, defense counsel said, "That's part of it."

The trial court replied that whether police applied such standards or procedures was irrelevant when the only issue was DeSoto's credibility, which was a matter for the jury to decide. The court referred to section 1127a, which sets forth the special instruction to be given for the jury to assess the testimony of an in-custody informant.[15] The court rejected the notion that, because the Legislature had adopted this statute, "there is a newly recognized field of expertise concerning inmate-informants . . . . [¶] The relevant part of Mr. DeSoto's testimony is what he had to say, whether there is any evidence of motive, bias, et cetera, which would have to be based on facts. And it is simply a matter of assessing the veracity of a witness. Whether some inmate-informants lie and some don't is a truism . . . . [¶] I think it comes back to the defense wanting this witness to give speculative information as to why this jury should conclude that this witness is not telling the truth. You haven't given me any specific offer of proof as to evidence that would rebut Mr. DeSoto's testimony that the sole source of [his] information was [defendant], other than saying there is a methodology and it is something that occurs in detention facilities where inmate-informants have access to other information, and sometimes or frequently use that information as a basis for snitching and then claim that another inmate gave him that information and confessed, when it wasn't the case. That strikes me as pure speculation, something that I can't let this jury do."

▮ In assessing defendant's claim that the trial court erroneously excluded Stevens's testimony, we apply the deferential abuse of discretion standard. (*People v. Jablonski* (2006) 37 Cal.4th 774, 805 [38 Cal.Rptr.3d 98, 126 P.3d 938] [" '[A]n appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence . . . .' "].) We find no abuse here. We agree with the trial court that, to the extent the purpose or effect of Stevens's testimony was to render an opinion about DeSoto's credibility, the testimony was inadmissible. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 82 [17 Cal.Rptr.3d 710, 96 P.3d 30] ["The general rule is that an expert may not give an opinion whether a witness is telling the truth, for the determination of credibility is not a subject sufficiently beyond common experience that the expert's opinion would assist the trier or fact; in other words, the jury generally is as well equipped as the

---

[15] "The testimony of an in-custody informant should be viewed with caution and close scrutiny. In evaluating such testimony, you should consider the extent to which it may have been influenced by the receipt of, or expectation of, any benefits from the party calling that witness. This does not mean that you may arbitrarily disregard such testimony, but you should give it the weight to which you find it to be entitled in the light of all the evidence in the case." (§ 1127a, subd. (b).) This instruction was given.

expert to discern whether a witness is being truthful."].) To the extent the purpose of the testimony was to demonstrate how inmate informants confabulate testimony, the trial court did not abuse its discretion in excluding the evidence on grounds of insufficient foundation in the absence of evidence either that DeSoto was a repeat inmate informant or of evidence contradicting his testimony that defendant was the sole source of his information. Therefore, we reject defendant's claim that the trial court erred when it excluded Stevens's testimony.[16]

### b. *Exclusion of Newspaper Articles*

Defendant contends that the trial court abused its discretion and violated various constitutional provisions when it refused to allow into evidence various articles from The Fresno Bee about defendant's case because, had they been read by DeSoto, they might have provided him with information from which he could have concocted his testimony. The trial court rejected the articles on the ground that, in the absence of any evidence that DeSoto had seen the newspaper articles, defendant's use of them was speculative.

His claim is without merit. Because, as the trial court noted, there was no evidence that DeSoto had obtained his information about the case from any source other than defendant himself, admission of this evidence was not relevant to any disputed fact, but would simply have invited the jury to speculate that DeSoto, from his jail cell in Los Angeles, had somehow come across these newspaper articles and used them to confabulate his testimony. The trial court properly excluded the evidence. (*People v. Morrison* (2004) 34 Cal.4th 698, 711 [21 Cal.Rptr.3d 682, 101 P.3d 568] ["Evidence is irrelevant . . . if it leads only to speculative inferences."].)

### c. *Limitations on Cross-examination of DeSoto*

During defendant's cross-examination of DeSoto, defense counsel asked DeSoto whether he had asked to be placed in protective custody in prior cases in order to demonstrate that DeSoto had acted as an informant in those prior cases. The trial court permitted defense counsel to ask DeSoto whether he had sought protective custody in this case, but not as to an earlier period of time, and sustained relevancy objections to those questions. Defendant

---

[16] We deny defendant's request that we judicially notice a report of the 1989–1990 Los Angeles County Grand Jury regarding the involvement of jailhouse informants in the criminal justice system in Los Angeles County. Because defendant failed to establish an adequate foundation that DeSoto was the type of informant covered by the report (by, for example, presenting evidence he was a repeat inmate informant), the report is irrelevant. (*Mangini v. R. J. Reynolds Tobacco Co.* (1994) 7 Cal.4th 1057, 1063 [31 Cal.Rptr.2d 358, 875 P.2d 73] ["Although a court may judicially notice a variety of matters (Evid. Code, § 450 et seq.), only *relevant* material may be noticed."].)

maintains this was error because the question was relevant to whether DeSoto "was testifying in hope of receiving benefits from the prosecutor." Not so. Whether DeSoto sought to be placed in protective custody in other cases at earlier times was not relevant to whether he had received any benefits in connection with his testimony in this case. The trial court did not abuse its considerable discretion in sustaining the objection.

### d. *Admission of Steven Farmer's Statement*

Defendant's theory at trial was that Steven Farmer, and not defendant, assisted Duane Holt in the murder of Richard Urban. Farmer refused to testify, invoking his privilege against self-incrimination. Instead, the defense called Cliff Garoupa, a defense investigator for Duane Holt. He testified that when he had visited Farmer in custody, after telling him that Grajiola had accused him of being involved in the Urban murder, Farmer told him to convey a message to a member his family to "get rid" of a pair of boots. The purpose of this evidence was to establish a consciousness of guilt on Farmer's part. In rebuttal, the prosecution was allowed to call Detective Pete Chavez. Chavez testified that Farmer had told Chavez he spent the night of the murder at his parents' house. The trial court admitted the testimony over a defense hearsay objection under Evidence Code section 1235, as a prior inconsistent statement.

On appeal, defendant contends, and the Attorney General concedes, that the trial court erred in admitting the testimony under this section because that section applies only when "the [prior] statement is inconsistent with [the witness's] testimony *at the hearing* . . ." (Evid. Code, § 1235, italics added), and, in this case, Farmer did not testify. Nonetheless, the Attorney General contends the statement was admissible under Evidence Code section 1202 and, in any event, any error was harmless.

 Evidence Code section 1202 states in part: "Evidence of a statement or other conduct by a declarant that is inconsistent with a statement by such declarant received in evidence as hearsay evidence is not inadmissible for the purpose of attacking the credibility of the declarant though he is not given and has not had an opportunity to explain or to deny such inconsistent statement or other conduct." "Section 1202 creates 'a uniform rule permitting a hearsay declarant to be impeached by inconsistent statements in all cases, whether or not the declarant has been given an opportunity to explain or deny the inconsistency.' (Cal. Law Revision Com. com., 29B, pt. 4 West's Ann. Evid. Code (1995 ed.) foll. § 1202, p. 27.) [¶] The purpose of section 1202 is to assure fairness to the party against whom hearsay evidence is admitted without an opportunity for cross-examination." (*People v. Corella* (2004) 122 Cal.App.4th 461, 470 [18 Cal.Rptr.3d 770].)

We find Evidence Code section 1202 to be inapplicable. Farmer's statement was not hearsay but simply verbal conduct consisting of a directive that was neither inherently true nor false. Furthermore, the statement was offered for the nonhearsay purpose of demonstrating consciousness of guilt. Accordingly, as he was not a "hearsay declarant," section 1202 does not apply. Thus, there was no basis upon which to permit Chavez's testimony. It should be noted, however, that the testimony was less than compelling rebuttal since, if Farmer had been involved in Urban's murder, it can be assumed he would have lied to a police detective questioning him about it. Moreover, any error was harmless given the powerful evidence of defendant's guilt that included evidence that he and Holt had left Holt's residence with Urban the day of the murder, defendant's possession of the rings Urban had offered to Holt as payment for drugs and defendant's admissions to Baxter and DeSoto that he had shot and killed Urban.

### C. Penalty Phase Claims

Defendant advances a number of challenges to the death penalty statute which, as he acknowledges, we have previously considered and rejected. We do so again.

"Section 190.2 is not impermissibly broad in violation of the Eighth Amendment." (*People v. Loker* (2008) 44 Cal.4th 691, 755 [80 Cal.Rptr.3d 630, 188 P.3d 580]; see *People v. Richardson, supra*, 43 Cal.4th at p. 1037.) "Section 190.3, factor (a), which allows the jury to consider '[t]he circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true pursuant to Section 190.1,' does not violate the Fifth, Sixth, Eighth, or Fourteenth Amendment to the United States Constitution by allowing arbitrary imposition of the death penalty." (*People v. Loker, supra*, 44 Cal.4th at p. 755.) "[T]he statute is not unconstitutional because it does not contain a requirement that the jury be given burden of proof or standard of proof instructions for finding aggravating and mitigating circumstances in reaching a penalty determination, other than other crimes evidence, and specifically that all aggravating factors must be proved beyond a reasonable doubt, or that such factors must outweigh factors in mitigation beyond a reasonable doubt, or that death must be found to be an appropriate penalty beyond a reasonable doubt . . . ." (*People v. Panah* (2005) 35 Cal.4th 395, 499 [25 Cal.Rptr.3d 672, 107 P.3d 790].) "Nothing in *Cunningham v. California* (2007) 549 U.S. 270 [166 L.Ed.2d 856, 127 S.Ct. 856], *Apprendi v. New Jersey, supra*, 530 U.S. 466, or *Ring v. Arizona, supra*, 536 U.S. 584, affects our conclusions in these regards. [Citations.] [¶] The failure to require intercase proportionality does not violate due process or the Eighth Amendment. [Citations.]" (*People v. Loker, supra*, 44 Cal.4th at pp. 755–756.) Finally, "[w]e again reject the

argument that the death penalty statute is contrary to international norms of humanity and decency, and therefore violates the Eighth and Fourteenth Amendments." (*Id.* at p. 756; see *People v. Richardson, supra,* 43 Cal.4th at p. 1037; *People v. Hillhouse* (2002) 27 Cal.4th 469, 511 [117 Cal.Rptr.2d 45, 40 P.3d 754] ["International law does not prohibit a sentence of death rendered in accordance with state and federal constitutional and statutory requirements."].)

## IV. DISPOSITION

We affirm the judgment.

George, C. J., Kennard, J., Werdegar, J., Chin, J., Corrigan, J., and Needham, J.,[*] concurred.

Appellant's petition for a rehearing was denied July 8, 2009, and the opinion was modified to read as printed above. Baxter, J., did not participate therein.

---

[*]Associate Justice, Court of Appeal, First Appellate District, Division Five, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.