Filed 9/13/16  P. v. Deegan CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| THE PEOPLE, | C078447 |
| Plaintiff and Respondent, | (Super. Ct. No. 62131996) |
| v. | |
| SIDNEY ROSS DEEGAN III, | |
| Defendant and Appellant. | |

Following his arrest for a parole violation, defendant Sidney Ross Deegan III appeared in court for arraignment.  During the hearing, defendant became verbally abusive toward the judge.  An amended information charged defendant with threatening a judge and criminal threats.  (Pen. Code, §§ 76, subd. (a), 422, subd. (a).)[1]  A jury convicted defendant on both counts.  Sentenced to nine years in prison, defendant

---

[1] All further statutory references are to the Penal Code unless otherwise designated.

1

appeals, contending the court erred in denying his motion for acquittal based on the insufficiency of the evidence, the court erroneously excluded evidence defendant suffered from posttraumatic stress disorder (PTSD), and the court abused its discretion in denying defendant's *Romero* motion.[2]  We shall affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

In July 2014 defendant was arrested for a parole violation.  An amended information charged defendant with threatening a judge and criminal threats.  The information also alleged defendant had one strike prior, a prior serious felony conviction for criminal threats, and had served three prior prison terms.  (§§ 1170.12, subds. (a)-(d), 667, subds. (a)(1), (b)(1), 667.5, subd. (b).)

Defendant filed a motion for judgment of acquittal based on insufficient evidence. (§ 1118.1.)  The trial court denied the motion.  The following evidence was brought before the jury.

**The Hearing**

Approximately two weeks after his arrest, defendant appeared before the Honorable Frances Kearney for arraignment.  Prior to the hearing, Judge Kearney reviewed the charges against defendant and the petition for revocation.  The petition stated defendant was on parole for committing corporal injury on a spouse, terrorist threats, and causing a fire in an inhabited building.

At the hearing, Judge Kearney advised all the defendants at the hearing of their rights.  When defendant's case was called, Judge Kearney asked if defendant wanted a public defender appointed to represent him.  Defendant was handcuffed and chained during the proceeding.  After defendant stated he wanted to represent himself, Judge Kearney told him it was "usually a really bad idea" to represent oneself.  She offered to

---

[2]  *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 (*Romero*).

2

continue the matter for one day to allow defendant to "think about what [he] want[ed] to do [since he was] looking at some substantial time."

Defendant responded that he wanted to resolve the case that day. Judge Kearney explained that she was not familiar with his case but the parole violation alleged usually carried a minimum of six months in custody. She continued: "I'm not done talking. There is no way we are going to be able to resolve the case today, so you might want to consider an appointment of counsel if you cannot afford [to] hire an attorney. If after you and the public defender talk you don't like what you are hearing, then of course you could always represent yourself at that point. This is a complicated matter with a lot of allegations about how you violated your parole. I can set it for a contested hearing or give you a chance to talk to the public defender."

Defendant stated he was agreeable to the district attorney's resolution of the matter. The court conferred with the prosecution, who confirmed the People were seeking 180 days in custody. Defendant explained his parole was due to terminate in November and he "want[ed] to max and get out of here without no papers." He also asked the court to grant him a *Cruz* waiver for one week so he could find someone to care for his dog.[3]

Judge Kearney replied that she would not release defendant. She outlined two options: accept appointment of the public defender and continue the matter into the next week so they could discuss his options, or represent himself but have the matter continued for two days so the prosecutor could confirm the proposed disposition with the parole department.

The court and defendant had the following exchange: "The Defendant: What would it take to max me out right now?

_____

[3] *People v. Cruz* (1988) 44 Cal.3d 1247, 1254, footnote 5 (*Cruz*).

"The Court:  I don't know.

"The Defendant:  Ask them.

"The Court:  I'm going to put the arraignment over to Friday at 8:30.

"The Defendant:  First of all, this is a violation of my rights.  Arraignment should take three days after the arrest upon which my parole officer is supposed to have the report.

"The Court:  We're going to take a short break."

As the bailiffs approached defendant to escort him out of the courtroom, defendant said:  "Fuck you, mother fucker.  Fuck you too, bitch.  You don't know who the fuck this is.  This is manic mother fucking high beams right here.  You know your car is going to blow up."  The court said:  "Did we get that on the record?  Further charges.  No bail."

Defendant jumped up from his seat and had to be restrained as he made the threat and was escorted from the courtroom.  Courtroom staff testified defendant was disruptive throughout the hearing and was "out of . . . control" when he threatened the judge.  The bailiffs considered defendant a safety risk.

Judge Kearney testified she was "taken aback" and "surprised" by defendant's words because no one had ever threatened to blow up her car in her 17 years as a judge. Although she remembered asking the court reporter if defendant's statement had been reported, she could not recall saying, "Further charges.  No bail."  The statements did not make sense to Judge Kearney because she is not responsible for filing charges.

After finishing the arraignment calendar, Judge Kearney retired to her chambers. Initially, Judge Kearney did not "think that much" about defendant's threat because he was in custody.  Although she was aware of defendant's prior incarceration, she did not know the extent of his criminal record.

When Judge Kearney's bailiff suggested defendant had access to a telephone and might have friends, she became fearful and concerned that something could happen.

4

Judge Kearney interpreted defendant's threat to blow up her car as a threat against her life.

Judge Kearney left the building later that day and walked alone to her car, which was parked in a secured parking lot. After she went home, the incident was only in the back of her mind as a concern. Later she spoke with Detective Addison, who told her defendant had apologized for his statement to the judge. After their conversation, Judge Kearney felt "significantly better" because defendant had apologized for his behavior and it was "obvious" he was having a bad day.

Judge Kearney asked to be reinterviewed by her bailiff about a month after the incident. She wanted to make sure that the appropriate parties understood that she felt defendant was having a bad day when he made the threat. In addition, she wanted to express that she did not "have strong feelings about how the case was handled, [and] that [she] was [not] asking for something."

Approximately one week prior to trial, Judge Kearney told the prosecutor and investigator that she had not been fearful when defendant made his threat because he was in custody and she thought he was angry because she failed to grant his release request. Judge Kearney believed defendant's apology and a restraining order would be an appropriate resolution. Going through with the trial would be worse, because it "had the potential to make people angry."

At trial, the jury heard a recorded conversation between defendant and his mother in which they discussed the charges against him. Defendant admitted the threat, explaining: "[T]hey were violating my rights, so I got mad and fuckin, I flew off the handle."

Defendant's parole officer testified that the recommended punishment for defendant's parole violation had been 180 days. After taking his custody credits into account, defendant would have been released from custody no later than October 10, 2014.

5

For his defense, defendant requested to present expert testimony on PTSD, arguing it was relevant to whether he actually formed the specific intent to threaten the judge. After hearing the proffered evidence outside the jury's presence, the court excluded the evidence.

**The Aftermath**

The jury convicted defendant on both counts. Defendant waived a jury trial on the priors and admitted them. The court granted the prosecution's motion to dismiss the three prior prison term enhancements in the interest of justice.

Prior to sentencing, defendant filed a *Romero* motion, which the court denied. The court sentenced defendant to nine years in prison: four years, double the middle term, for criminal threats, plus five years for the prior serious felony conviction. (§ 667, subd. (a).) Pursuant to section 654, the court stayed defendant's sentence for threatening a judge. Defendant filed a timely notice of appeal.

## DISCUSSION

### *SUFFICIENCY OF THE EVIDENCE*

Defendant challenges the sufficiency of the evidence to support either conviction. He contends the trial court erred in denying his motion for acquittal based on insufficient evidence.

Section 1118.1 provides, in relevant part, that the trial court, at the close of evidence and prior to submission of the case to the jury, "shall order the entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal."

The trial court must determine, based on the evidence that exists at the time of the motion, whether the prosecution has presented sufficient evidence to submit the matter to the jury. In making this determination, the court applies the same standard as we use to determine whether sufficient evidence supports the conviction on appeal. In effect, we

6

consider whether from the evidence including all reasonable inferences to be drawn, there is any substantial evidence of the existence of each element of the offense charged. This court views the evidence in the light most favorable to the prosecution and presumes in support of the judgment the existence of every fact the trial court could reasonably deduce from the evidence. (*People v. Stevens* (2007) 41 Cal.4th 182, 200; *People v. Johnson* (1980) 26 Cal.3d 557, 576.) On appeal, we review the court's denial of a motion for judgment of acquittal under the independent standard of review. (*Stevens*, at p. 200.)

**Criminal Threats**

To sustain a conviction for criminal threats, the prosecution must establish that (1) the defendant willfully threatened to commit a crime which would result in death or great bodily injury to another person; (2) the defendant made the threat with the specific intent that the statement was to be taken as a threat, even if there was no intent of actually carrying it out; (3) the threat was on its face and under the circumstances in which it was made so unequivocal, unconditional, immediate, and specific as to convey to the person threatened a gravity of purpose and an immediate prospect of execution of the threat; (4) the threat actually caused the person threatened to be in sustained fear for his or her own safety; and (5) that the threatened person's fear was reasonable under the circumstances. (§ 422; *People v. Toledo* (2001) 26 Cal.4th 221, 227-228.)

The court also instructed the jury that "[s]omeone commits an act willfully or on purpose. In deciding whether a threat was sufficiently unequivocal, immediate, unconditional and specific . . . consider those words themselves as well as surrounding circumstances.

"Someone who intends that a statement be understood as a threat does not have to actually intend to carry out the threatened act or intend to have someone else do it. Great bodily injury means significant or substantial physical injury. It's an injury that is greater than a minor or moderate harm. Sustained fear means fear for a period of time that is

7

more than momentar[y], fleeting or transitory. An immediate ability to carry out the threat is not required."

Defendant argues there was no evidence that (1) he willfully threatened to commit a crime that would result in great bodily injury or death, (2) he had the specific intent that his statements be taken as threats, and (3) that his threat caused Judge Kearney to be in sustained fear.

The prosecution presented evidence that defendant threatened to commit a crime which would result in great bodily injury or death. However, defendant characterizes his words as simply "frustration in a fit of pique" and "mere hyperbole untethered to reality and no basis to find a true threat."

In retrospect, defendant may regard his utterances as "mere hyperbole untethered to reality," but others, including the victim, disagree. Words that are so unequivocal, unconditional, immediate, and specific as to convey a gravity of purpose and an immediate prospect of execution of a threat do not lose their impact because the speaker, on reflection, thinks better of it. The evidence supports the verdict.

Defendant stated, in court, before Judge Kearney: "Fuck you, too, bitch. You don't know who the fuck this is. This is maniac mother fucking high beams right here. You know your car is going to blow up." Judge Kearney testified she interpreted defendant's statement as a threat against her life. Defendant made the statement of his own volition as bailiffs approached to remove him from the courtroom. Courtroom staff stated defendant was disruptive and out of control during the hearing.

Evidence before the jury also supported the inference that defendant intended his statements as a threat against the judge. Defendant admitted he "flew off the handle" and later apologized for his outburst. Courtroom staff testified defendant jumped from his seat as he made his statement. Bailiffs restrained defendant and removed him from the courtroom.

8

Finally, defendant argues Judge Kearney was not in fear or sustained fear following the threat. According to defendant, "the judge's action of walking alone to her car and driving home—within an hour or two of Deegan's statements in the courtroom—and thereafter at home being reassured no threat was intended, inarguably show both that she did not seriously take his words as a true threat and that they did not cause her sustained fear."

Defendant's careful parsing of Judge Kearney's language and his gloss on events ignores Judge Kearney's testimony that she indeed did fear that something could happen, that she felt threatened. Subsequently, during cross-examination, defense counsel asked: "Was it a threat to blow your car up, the property damage, or how did you assume that it was . . . a threat against your life as you said a threat against your life, or did you?" Judge Kearney replied: "The thought of getting in my car and it blowing up, that's a threat against my life." Defense Counsel said: "Okay. So that's the way you took it at the time?" Judge Kearney replied: " 'Your car is going to blow up,' that's how I would take it, yes." Contrary to defendant's assertion, Judge Kearney felt threatened by defendant's words, an apprehension heightened when the bailiff reminded her that defendant, although in custody, had access to a telephone and the ability to communicate with a potential confederate. Defendant insists that defendant's words and conduct are far less egregious than certain other cases in which substantial evidence claims were rejected. Perhaps, but that is beside the point. The question is whether substantial evidence supports the jury's verdict. We answer that question in the affirmative.

**Threatening a Judge**

Section 76, subdivision (a) sets forth the elements of the crime of threatening a judge: "Every person who knowingly and willingly threatens the life of, or threatens serious bodily harm to, any … judge . . . with the specific intent that the statement be taken as a threat, and the apparent ability to carry out that threat by any means, is guilty of a public offense . . . ."

9

The court provided the following definitions. "A threat may be oral or in writing and it may be implied by a conduct or combination of statements and conduct when a person making a threat is an incarcerated prisoner with a stated release date. The ability to carry out that threat includes the ability to do so in the future.

"When the person making the threat is an incarcerated prisoner without a stated release date the ability to carry out the threat also carries the ability [to] do so by the use of bail, change of plea, or some other reasonable means.

"Serious bodily injury includes serious physical injury or serious traumatic condition. Someone who intends that a statement be understood as a threat does not have to actually intend to carry out the threatened act or threaten to have someone else do so."

Defendant reiterates his previous argument by reference and adds that the prosecution "presented no evidence . . . of any indication Deegan attempted to contact someone on the outside, that there was anyone on the outside who would or could do Deegan's bidding in this regard, or indeed that Deegan took any action to carry out this so-called threat."

However, section 76 does not require that the prosecution prove that defendant had a confederate ready, willing, and able to carry out his threat. Section 76 requires evidence that defendant had the apparent ability to carry out the threat because he was likely to be soon released from custody. The evidence revealed defendant would have been released from custody no later than October 10, 2014, providing sufficient evidence of defendant's ability to carry out his threat.

### EVIDENCE OF PTSD

Defendant sought to introduce evidence he suffered from PTSD at the time he threatened Judge Kearney. The court held an Evidence Code section 402 hearing but declined to admit the proffered evidence.

10

**Background**

Prior to trial, the prosecution filed a motion in limine to exclude evidence regarding defendant's mental health as lacking both foundation and relevance. During in limine proceedings, defense counsel informed the court he intended to present testimony from Peter Kalmar (Kalmar), a marriage and family counselor who had evaluated defendant at the jail. The court reserved ruling on the issue until it could conduct an Evidence Code section 402 hearing.

At the hearing Kalmar testified he had both a bachelor's and a master's degree in psychology and counseling and was a licensed marriage family therapist. In addition to his private practice, Kalmar had provided mental health services to inmates at the county jail for 11 years. Kalmar screened inmates for mental health symptoms, obtaining treatment records and verifying inmates' current medications, providing suicide risk assessments, and coordinating with classification officers for appropriate housing.

Kalmar also engaged in brief cognitive therapy sessions to help inmates cope with being in jail and psychoeducation to help inmates understand various aspects of mental health treatment and how to treat them. He served approximately 3,000 inmates per year, which over the years totaled over 30,000 inmates. Kalmar performed diagnostic impressions, generally not full assessments and diagnostic work; those were performed by psychologists at the jail. Nor did he prescribe or manage inmates' medications; that task was performed by the jail psychiatrist.

Kalmar met defendant through his work at the jail. He kept contemporaneous records of their sessions, which consisted of "SOAPS," or subjective observations, objective observations, assessment, and plan for follow-through. Kalmar was familiar with PTSD, which was one of the diagnostic impressions he had of defendant. They discussed the issue in counseling sessions. Defense counsel offered Kalmar as an expert on PTSD so he could testify about the disorder, his assessment of defendant, and how a person suffering from the condition acts and reacts.

11

The prosecution requested further voir dire. In addition to his master's degree in psychology, Kalmar had also completed 36 units of continuing education for every two-year renewal of his license. He had a "fair amount" of training in PTSD. Kalmar had not completed an assessment regarding defendant's mental state prior to the incident with Judge Kearney. He had never previously been called to testify or been qualified as an expert on PTSD.

Kalmar spoke with defendant the day after the incident. They discussed PTSD and Kalmar noted that defendant had made threats in court. He performed a mental status exam to assess whether defendant needed a follow-up referral for treatment. However, the purpose of the exam was not to ascertain defendant's mental state at the time of the incident. Kalmar's assessment was that defendant suffered from PTSD, anxiety, anger, and poor impulse control.

According to Kalmar, PTSD could have been a factor in defendant's behavior in court, but he "didn't really assess what happened in court or go into that." Kalmar testified defendant's behavior could have been related to his PTSD because it fit the pattern of difficulty in controlling emotion and impulse. However, Kalmar confirmed his opinion simply explained the reason for defendant's outburst but did not explain what defendant was thinking or whether he was serious or joking.

Defense counsel continued the direct examination of Kalmar. Kalmar stated he could explain what PTSD is and how someone develops the condition. He testified his assessment of defendant had included a discussion of the circumstances that caused defendant to have PTSD.

The court questioned Kalmar. Kalmar explained that his assessments involved creating diagnostic impressions, reflecting the fluidity of his subject's mental state and the fact that some conditions are only temporary. Kalmar noted defendant's history and relied on the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition

12

(DSM-IV) to help him determine the number of symptoms defendant had that were consistent with PTSD.

Kalmar first determined defendant suffered from PTSD in 2006 and referred him to a psychiatrist. However, defendant's medical record did not contain a psychiatric evaluation, so Kalmar assumed defendant had been released prior to seeing the psychiatrist. Defendant's medical records stated that on July 29, 2014, Dr. Baker, the jail psychiatrist, noted defendant suffered from drug abuse and personality issues.[4] Kalmar testified that he and Dr. Baker did not always agree on the diagnosis of a patient. Defense counsel offered Kalmar's testimony to inform the jury that defendant had been diagnosed with PTSD and to explain what the condition is and the psychological impact that certain stresses have on an individual suffering from the condition.

The court heard argument from the prosecution and defense. The prosecution argued there was no causal connection between defendant's condition and his state of mind when he threatened the judge. Defense counsel argued that two experts had diagnosed defendant with PTSD. However, the trial court noted only one expert was present, and he would not be able to testify as to Dr. Baker's diagnosis. Defense counsel replied Kalmar would be able to testify that he relied on Dr. Baker's diagnosis and that the jury should know that defendant suffered from PTSD and that certain stressors could cause him to lash out.

The court stated it understood defendant's argument but still needed to be convinced Kalmar was an expert on the issue. Defense counsel argued Kalmar diagnosed defendant with PTSD and Dr. Baker confirmed the diagnosis. Defense counsel noted defendant's homelessness was one of the stressors that caused him to lash out. The PTSD testimony would help explain why defendant lashed out at the judge, aiding the

---

[4] The incident took place on July 23, 2014.

13

jury in evaluating "the person . . . to make the assessment as to whether or not [his threat] was intentional." Defense counsel concluded that Kalmar had the education, professional license, and experience to explain the issues to the jury.

The prosecution reiterated that Kalmar lacked the qualifications or expertise to form an opinion on how PTSD related to defendant's intent when he threatened the judge, the issue central to the case. In addition, Kalmar's proposed testimony was intended to evoke sympathy from the jury, but there was no connection between PTSD and defendant's intent. In response, defense counsel argued that Kalmar's testimony was not being offered to testify about defendant's intent, but because he suffered from PTSD, the jury should be informed to enable them to decide whether defendant formed the requisite intent.

The court tentatively ruled that it was inclined to exclude the testimony because although Kalmar was qualified to diagnose defendant with PTSD, he was not qualified to testify about how the diagnosis explained defendant's actions or intent at the time of the incident. Defense counsel filed a motion for reconsideration, arguing case law permitted expert testimony that a defendant suffers from a particular mental disease or disorder. In response, the prosecution argued defendant failed to show how the PTSD evidence was relevant to the issue of defendant's intent: "The only question is did he intend to make the threat, not why he intended to make the threat, which is the PTSD . . . ."

Defense counsel explained the testimony would explain the effect PTSD had on defendant's ability to control his actions and whether he "flew off the handle without thinking." In addition, Kalmar would not be asked to form an opinion as to whether defendant had the specific intent at the time.

The court again expressed reservations about Kalmar's qualifications but ruled the evidence would be excluded because it would lead to confusion and uncertainty among the jury. Kalmar did not "treat anybody" but provided counseling and performed intake

14

assessments. According to the court, Kalmar "might be able to do an assessment and say so-and-so has PTSD, but as far as taking it to the next step, that's why I'm at foul here."

In response, defense counsel stated he expected Kalmar to testify about his educational background and explain the process of performing assessments before referring the patient to a psychiatrist who then would conduct a diagnostic evaluation. Kalmar would also testify that he counseled patients so they knew how to cope with their conditions to prevent outbursts. Defense counsel explained Kalmar "has the qualifications to make that diagnosis. And the fact that he diagnosed [defendant] with PTSD as well as [the] psychiatrist that backed his diagnosis up [shows he] knows what he's talking about and he can describe to the jury what that condition is and how people react under certain stressors."

The court affirmed its tentative ruling and excluded Kalmar's testimony.

**Discussion**

A person with special knowledge, skill, experience, training, or education in a particular field may qualify as an expert witness at trial. (Evid. Code, § 720.) However, an expert may offer his or her opinion only if it is related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact. (Evid. Code, § 801, subd. (a).)

The trial court possesses wide discretion to admit or exclude expert testimony. (*People v. Curl* (2009) 46 Cal.4th 339, 359.) We will not reverse the trial court's ruling on expert testimony unless we find a manifest abuse of discretion. (*People v. Lee* (2011) 51 Cal.4th 620, 643.)

In addition, a trial court possesses broad discretion to exclude relevant evidence if its probative value is substantially outweighed by the probability that its admission will necessitate undue consumption of time or create a substantial danger of undue prejudice, or confusing the issues, or of misleading the jury. (Evid. Code, § 352.)

15

Defendant argues the court abused its discretion in finding that Kalmar was not qualified to render an opinion on the connection between PTSD and the issues in this case. "There is nothing in this record to support a finding that Kalmar was unqualified to explain how PTSD in a person suffering chronic stress, burdened with additional situational stress, could affect the elements of intent and willfulness at issue in the charged offenses." Defendant also challenges the court's finding that Kalmar's testimony would confuse the jury.

The trial court held a thorough hearing on Kalmar's background and credentials, heard extensive argument, and allowed both parties to present their viewpoints. Although the court expressed reservations about Kalmar's qualifications, it did not, as defendant asserts, exclude the evidence because Kalmar lacked a medical degree. The court found Kalmar qualified to diagnose defendant with PTSD but was not satisfied that Kalmar was qualified to explain how the condition affected defendant's actions and intent when he threatened Judge Kearney.

We find no abuse of discretion in the court's determination. Kalmar never evaluated defendant to determine his mental state following the incident or to provide an assessment of defendant's behavior before Judge Kearney. Nor did Kalmar offer a specific opinion as to how defendant's PTSD might have been a factor in the incident. On appeal, defendant contends Kalmar could have testified "that angry outbursts are a manifestation of the hyperarousal state that is a hallmark of PTSD." However, defense counsel did not offer Kalmar's testimony for this purpose in the trial court. Instead, defense counsel offered Kalmar's testimony as to defendant's PTSD diagnosis but left it up to the jury to determine how it impacted his behavior during the incident. The court properly excluded Kalmar's testimony.

### *ROMERO MOTION*

Defendant filed a motion pursuant to *Romero* requesting that the court dismiss the finding of his prior strike because of the minor nature of the current offense, in light of

16

the fact that he suffers from PTSD, the length of his sentence, and other miscellaneous factors. Defendant contends the court abused its discretion in denying the motion.

**Background**

The prosecution opposed defendant's *Romero* motion, arguing defendant was on parole at the time of the current offense. In addition, the behavior underlying the strike prior conviction included burning a home after beating and threatening to kill the resident, and defendant continued to commit criminal acts while on parole.

The trial court denied the motion, stating: "[T]he issue which I have to address is whether or not [defendant's] matter comes within the meaning or outside the meaning of the Three Strikes Law. I would note in ruling on this matter that [defendant's] matter that he was on parole for at the time of this offense was similar in nature to the offense he stands convicted of today, that being a 420. His prior case also involved an arson charge. I would also note that [defendant] has five prior felony convictions at the time of his arraignment. He was pending nine parole violations having absconded from release. I note further that he was released on probation on the prior 420 just months before this offense and was a parolee at large.

"I have been unable to find anything in the pleadings or in the review of the records that would suggest that [defendant's] background, character, or future prospects [are] favorable to the Court granting a Romero Motion, that is, striking a prior strike or conviction. His current behavior is so close in time to his release on parole. There's just nothing here for me to hang a hat on, so to speak."

**Discussion**

The "three strikes" initiative was intended to restrict a trial court's discretion in sentencing repeat offenders. (*Romero*, *supra*, 13 Cal.4th at p. 528.) The law does not offer a discretionary sentencing choice but establishes a sentencing requirement to be applied in every case where the defendant has at least one qualifying strike. However, if the sentencing court concludes an exception should be made because, for reasons that can

17

withstand scrutiny, a defendant should be treated as though he or she actually fell outside the three strikes scheme, the court may strike a qualifying strike. (*People v. Carmony* (2004) 33 Cal.4th 367, 377 (*Carmony*).)

We review the trial court's denial of a defendant's *Romero* motion for an abuse of discretion. We find an abuse of discretion only if the court's decision is so irrational or arbitrary that no reasonable person could agree with it. (*Carmony*, *supra*, 33 Cal.4th at pp. 376-377.) In making this assessment, "preponderant weight must be accorded to factors intrinsic to the scheme, such as the nature and circumstances of the defendant's present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character and prospects." (*People v. Williams* (1998) 17 Cal.4th 148, 161.)

Reversal of the trial court's denial of a *Romero* motion is justified when the trial court was unaware of its discretion to strike a prior, or refused to do so at least in part for impermissible reasons. However, if the trial court balanced the relevant facts and reached an impartial decision, we affirm the trial court's ruling even if we might have ruled differently. (*Carmony*, *supra*, 33 Cal.4th at p. 378.)

Defendant contends there are numerous reasons the court's denial of his motion constitutes an abuse of discretion. He points out he apologized for his statements to Judge Kearney shortly after the incident. In addition, he argues "the fact that the evidence of guilt is so thin is a powerful reason to strike the prior" and argues his undiagnosed PTSD provides some explanation for his prior criminal behavior.

We disagree. The record supports the court's reasons for denying the motion. Defendant's criminal record began in 1997, consisting of several misdemeanor and felony convictions. His prior strike conviction was for criminal threats, the same behavior charged in the current case. Defendant's prior performance on probation and parole was unsatisfactory, and he was on parole at the time of the current offense. According to defendant's parole officer, his prior performance on parole was "dismal,"

including three violations for methamphetamine use, failure to participate in a batterer's treatment program, failure to report to the parole agent, failure to follow instructions, and absconding. In addition, defendant admitted using methamphetamine "as much as possible." These facts support the trial court's finding that there was nothing in defendant's background, character, or future prospects favorable to granting his *Romero* motion. We find no abuse of discretion.

## DISPOSITION

The judgment is affirmed.


                                                    RAYE         , P. J.


We concur:



       BLEASE        , J.



       NICHOLSON    , J.


19