Filed 8/28/25  P. v. Trujillo CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>STEVEN DANIEL TRUJILLO,<br><br>    Defendant and Appellant. | B335643<br><br>(Los Angeles County<br>Super. Ct. No. XNVPA094651) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Hilleri G. Merritt, Judge. Affirmed.

James S. Donnelly-Saalfield, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Kenneth C. Byrne and Shezad H. Thakor, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Steven Daniel Trujillo stabbed two men with a knife, killing one of them, after hearing voices in his head telling him to kill someone. He appeals his conviction for first degree murder and attempted murder.

Trujillo argues the trial court wrongly excluded certain evidence at trial regarding his history of mental health and substance abuse and erred by refusing to give a jury instruction on imperfect self-defense. He also argues he received ineffective assistance of counsel. We reject his challenges and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### The Charges

On December 16, 2021, Trujillo was charged with the premeditated murder of Sean Driggs (Pen. Code,[1] § 187, subd. (a); count 1) and the attempted murder of D.S.[2] (§§ 187, subd. (a), 664; count 2).[3] It was further alleged that Trujillo personally used a deadly and dangerous weapon (knife) in those crimes. (See § 12022, subd. (b)(1).) He was tried by a jury during August 2023 and September 2023.

### Motions in Limine

Before trial, the court held extensive hearings on motions in limine and made the following rulings.

First, it would allow testimony by Trujillo's experts that they had reviewed certain medical and psychological records, and

---

[1] Undesignated statutory references are to the Penal Code.

[2] We refer to the surviving victim and another witness by their initials. (See Cal. Rules of Court, rule 8.90(b)(4), (b)(10).)

[3] In this summary, we focus on those facts relevant to the issues raised on appeal and " 'construe the facts in the light most favorable to the judgment.' " (*People v. Curl* (2009) 46 Cal.4th 339, 342, fn. 3.)

2

based on those and their own analyses, they had formed certain opinions. However, they could not testify to the diagnoses or opinions reflected in the medical records of nontestifying professionals, based on *People v. Sanchez* (2016) 63 Cal.4th 665, 685 (*Sanchez*).

Second, the trial court ruled that although the experts could opine Trujillo had a particular mental disorder, they could not state he did not have the capacity or ability to form a specific intent, or at the time of the offense he formed the intent. Trujillo's counsel conceded: "I think that is the state of the law." When the prosecution argued that the experts should not be allowed to tap dance around the topic of whether Trujillo met the specific intent requirement, the court further ruled that although experts could testify to general effects of certain drugs on the brain, whether the drugs in fact affected his ability to form the necessary intent was a jury question. Defense counsel agreed the law did not permit experts to give an opinion in this case, based upon Trujillo's methamphetamine use, that he acted in a particular way or intended particular things.

Third, the trial court excluded testimony of Trujillo's mother, Jovita Trujillo, proffered as background for the jury, regarding Trujillo's personal history and family dynamics. Defense counsel also sought to have Jovita testify about how, beginning in 2017 or 2018, she observed bizarre behavior by Trujillo, speaking to himself, "clearly evidencing that he was suffering." Defense counsel also offered her testimony that she assisted in getting him to see doctors and in getting him hospitalized at times. Counsel conceded those visits would also be reflected in medical records the testifying experts would be referencing. Finally, defense counsel offered Jovita's testimony that on, the day of the incident, Trujillo was isolating himself in

his room before his arrest. Counsel provided a full written proffer of Jovita's testimony, which stated Trujillo first sought mental health treatment in 2017 and he first told Jovita he was hearing voices in 2018 or 2019. It further listed his visits to various mental health facilities with no details as to what each visit was for, or what diagnosis he received.

The trial court stated that although in civil cases parties have leeway to offer the jury personal backgrounds, that "simply is not the case in criminal. Because at the end of the day I don't know under [Evidence Code section] 352 how helpful [introducing Trujillo] will be to the jury." The court excluded Jovita's testimony as to Trujillo's background and taking him to various mental health professionals, but allowed her to testify about his behavior on the day of the incident.

Fourth, the trial court excluded the testimony of Dominic Perez, a close friend of Trujillo's since the fourth grade. The proffered testimony was that Perez became aware of significant behavior changes in Trujillo starting around 2017 and it became clear to him in 2018 that Trujillo was using drugs or suffering from mental illness or some combination of the two, at which point Perez cut off communication. The court disallowed the testimony under Evidence Code section 352 because while it might show the jury that "hey, things were good and then they were bad," nevertheless "how under [section] 352 does that help the jury figure out what happened on May 15, 2020?" The court noted the evidence might well be relevant to factors in mitigation if there were a conviction, and ruled the issue could be revisited later during the trial after hearing additional evidence.

The court later confirmed after Trujillo's testimony it would exclude the testimony of Perez and that Jovita could testify only

as to her observations of Trujillo on May 15, 2020. Based on that ruling, defense counsel chose not to call Jovita.

**The People's Case**

On May 15, 2020, D.S. drove to a 7-Eleven store in Santa Clarita around 10:00 p.m. D.S. testified he exited his vehicle, Trujillo came up to him, they looked at each other for a minute, then Trujillo stabbed him in the neck. Trujillo said nothing to him and D.S. said nothing before the attack. D.S. had never seen Trujillo before, and they had never been in any kind of dispute.

After stabbing D.S., Trujillo pursued him for a few seconds and tried to stab him again. Then D.S. went to his car, retrieved a hand towel to slow the bleeding, went into the 7-Eleven and asked the cashier to call the sheriffs. Later that night after D.S. went home, he realized the bleeding would not stop, so he called 911. He was transported to a hospital and received stitches.

That same night, at around 11:30, witness R.S. was at another 7-Eleven on the same street in Santa Clarita as the first 7-Eleven. While her husband went into the 7-Eleven, she stayed in their truck and observed a man (later identified as Driggs) standing next to a cafe close by, yelling or talking to himself, although she could not make out the words. Then she heard somebody yelling for help, and when she turned around she saw Trujillo had walked up to the man and was repeatedly stabbing him. She did not see the victim doing anything with his hands or threatening or saying anything to Trujillo. After the stabbing, she saw Trujillo take off his shirt and throw it in a trash can. She called 911 and stayed on scene when the deputies arrived. At trial, she identified Trujillo in a surveillance video as he removed his shirt.

**The Defense Case**

As defense counsel conceded, the evidence was overwhelming as to identification of Trujillo as the perpetrator. The defense therefore challenged intent based on mental health and substance abuse issues.

After the prosecution rested, the trial court provided the general parameters of what witnesses for the defense could testify to: "there can be general testimony regarding his substance abuse and auditory hallucinations. Both were at play on May 15 ostensibly. . . . [¶] . . . I understand the jury needs to know what he was suffering from on May 15. I also know that I told you very generally that it can be gone into with him and the doctors that he has had a history of mental health issues. That's fair. It's not like oh, I decided that is what I'm going to say to people. He has been hospitalized and had treatments. The fact there has been an ongoing issue is fair." However, the court continued, "the only thing that is really germane to this jury is how anything they believe that he had ingested or was suffering from on May 15 . . . affected him on May 15. The doctor will be allowed to testify about how certain things can affect people [but] cannot testify as to whether or not it impaired his ability or affected his ability to form that particular mental state or intent. That's the jury's purview."

The trial court ruled that Trujillo or his experts could testify as to any drugs he was taking on May 15, 2020, generally about his treatment for certain mental health disorders from 2017 to the present, and anything he took after he was arrested that could have affected his ability to recall or perceive things. However, the court otherwise excluded his proffered testimony about his experiences in jail after being arrested, his brief work history, and his "entire detailed history of different mental

6

illnesses and different places he stayed," under Evidence Code section 352. Defense counsel objected to the limitations set on the defense testimony.

Trujillo testified he was presently 30 years old, and was taking Zyprexa, Remeron, melatonin, and Benadryl. He confirmed that, over the years, he had been treated by doctors in hospital settings for mental health issues. He testified that over the last several years he had used marijuana, alcohol, methamphetamine, heroin, mushrooms, LSD, Xanax and Ecstasy. On May 15, 2020, the date he assaulted and killed someone, he used marijuana, alcohol, and methamphetamine. That day, he was hearing voices, and he made a phone call to a mental health professional. However, he did not tell the professional he was hearing voices because he was embarrassed and did not want him to "think I was crazy."

He testified that before May 15, he had heard voices, both male and female, talking about aliens and the Illuminati conspiracy theory. He testified he heard such voices "[a]ll day every day," but the first time they ever directed him to commit violence was on May 15.

On the morning of May 15, Trujillo smoked methamphetamine and then marijuana at his home in Santa Clarita. In the afternoon, he got two 40-ounce bottles of beer and took them home to drink, along with a bottle of tequila that he had at home. He was pretty "spun out" from all those substances. All day, he heard auditory hallucinations or voices. It was normal for him to have conversations with the voices; they talked about different races of aliens, their presence here on earth, "crazy stuff." They got angry and called him a bitch, told him to kill himself, told him they were going to kill him, and then told him he should kill someone. He said no, he did not want to do it, but

7

they told him to do it tonight, kill someone in Valencia. Then they told him to go for a walk. He took his pocketknife with him.

Trujillo left the house and went for a walk, angry because the voices kept telling him to just do it, and eventually he told the voices okay, but he would not kill any children or women. He walked to a 7-Eleven and saw D.S.'s car and D.S. was smoking a cigarette. In his head, he thought D.S. knew he was coming and D.S. was communicating with the same voices that Trujillo was talking to, because D.S. looked at him like he expected Trujillo to be there. Trujillo walked away and then turned and "engaged," attacking D.S. in the neck with the knife because the voices told him to do it.

When D.S. ran away, Trujillo left the 7-Eleven because he was afraid people were going to see him. He started walking home, but the voices told him that he was a bitch because he did not "do it." He felt very bad, suicidal; so he jumped in front of a moving car hoping it would hit him. He testified he had had suicidal thoughts previously, and he had been treated by doctors and medical institutions for that. As he continued walking, he saw some kids skateboarding, but he thought, "I'm not going to hurt them." He saw a homeless person lying down, but when he got nearer, he saw that it was a woman, and thought to himself, "no way."

Trujillo arrived at a second 7-Eleven and in the parking lot he saw Driggs "yelling to nobody." Driggs was about 46 feet away from Trujillo when Trujillo first saw him. Trujillo thought Driggs was talking to the same voices Trujillo was talking to, so he walked up to Driggs and Driggs "turn[ed] on [him]," stopped yelling, and pushed his chest out. Trujillo "assum[ed] that he thinks I'm going to kill him and he's gonna fight me. So I pull out my knife." Trujillo admitted Driggs had not been yelling or

talking to him, and Driggs did not provoke him. Driggs did not have any weapon, put up a fist, or try to kick Trujillo. Trujillo hoped Driggs would kill him.

Trujillo admitted he stabbed Driggs as many as 25 times because he was "angry, depressed. Voices told me to do it, and I lashed out." He wanted to make him go down. He admitted he stabbed Driggs "with the intention to kill him," and he had that intent before he got to him and started stabbing him. Then Trujillo walked away, wiped his knife clean of fingerprints with his shirt, and threw the knife in the trash can. As he walked away, the voices told him Driggs had died, but not to worry, because he was "a copy." He was arrested later that night, and lied to the detectives because he did not want to go to jail, and because the voices were telling him to lie. He testified he had smoked a lot of weed and methamphetamine all his life, and that made it hard to remember things.

Trujillo called two experts to testify on his behalf. Dr. Daniel King, a licensed psychologist, testified he interviewed Trujillo and reviewed various medical records relating to his mental health and treatment, including from Action Family Counseling (Aug. 2017 to Oct. 2017), UCLA Santa Monica Emergency Room (Jan. 2019), Behavioral Mental Center in Alhambra Hospital for a three-day commitment (Jan. 2019), Los Angeles County of Mental Health Outpatient Olive View (Jan. 2019 to Aug. 2019), Henry Mayo Newhall Hospital Emergency Room (Feb. 2019 and Apr. 2019), Bautista Medical Group (May 13, 2020), Los Angeles County Department of Mental Health Santa Clarita (May 2020 to June 2020), records from therapist Linda Laffey (Aug. 2019 to Nov. 2019), Letter from Trascender Lifecology (Nov. 2019 to May 2020), and Los Angeles County Jail mental health records (May 15, 2020 to the present).

Dr. King testified his diagnosis of Trujillo's mental health condition on May 15, 2020, was "Unspecified depressive disorder. Stimulant use disorder. Amphetamine-type substance. Alcohol use disorder and cannabis use disorder." He testified it was his opinion that Trujillo was likely not feigning psychiatric illness.

On cross-examination, Dr. King explained his diagnosis was based in part on what various clinicians documented in their records. He testified the data do not support a diagnosis of schizophrenia spectrum disorder, which contradicted another report he had reviewed, that of Dr. Risa Grand. He conceded he had noted some inconsistencies with Trujillo's reporting, and in his medical report he indicated he doubted the veracity of Trujillo's self-reporting. On redirect, Dr. King agreed "there is a possibility that he has schizophrenia in that substance abuse has exacerbated the condition. . . . Because methamphetamine use especially produces symptoms that are exactly the same as schizophrenia. So when someone is actively using it is hard to know if it is the drug use or also schizophrenia."

Dr. Grand testified for Trujillo as a forensic psychiatrist. She interviewed Trujillo twice, and she reviewed the same records Dr. King had, in addition to reviewing his reports. It was her diagnosis that on May 15, 2020, Trujillo was suffering from either schizoaffective disorder, which is a mix of psychotic symptoms and mood symptoms, or schizophrenia, which can be worsened in a person that is abusing substances. She explained a diagnosis of schizophrenia means a person experiences a "break with reality. They may hear voices or have delusions which is a fixed false belief. They may hear a song or see something on TV that they think is for them." She explained that drugs like methamphetamine can exacerbate symptoms such as delusions, hallucinations, and paranoia.

Dr. Grand testified a person with such a diagnosis could experience delusions, auditory hallucinations, and lose touch with reality, and taking drugs such as methamphetamine, cannabis, and alcohol, can increase the likelihood of causing such problems. She testified alcohol can cause disinhibition of behavior, a psychotic person on methamphetamine might misperceive the intentions of others, and the confluence of drugs, lack of sleep, combined with psychosis is a recipe for "unpredictable violent behavior."

Dr. Grand testified Zyprexa is an antipsychotic medication frequently prescribed for individuals suffering from schizophrenia; Remeron is an antidepressant medication; melatonin helps regulate the sleep/wake cycle; and Benadryl can be used for sedation or to prevent side effects of certain anti-psychotic medications. She further testified that taking such medications could affect some people's ability to relate their medical histories.

Dr. Grand also testified a person experiencing auditory hallucinations might respond to them verbally out loud, while others might restrain the urge to respond and respond in their heads without saying anything out loud. She offered her opinion that Trujillo was not malingering. On cross-examination, she agreed she had evaluated Trujillo and found him legally sane. She also acknowledged previously reporting that, although Trujillo "was forward and forthcoming," she "questioned his sincerity."

**Imperfect Self-defense Jury Instruction**

At the conclusion of the trial, the court rejected the defense request for a jury instruction on imperfect self-defense, noting: "[t]here is nothing that even comes close." The court recited Trujillo's testimony that when he saw Driggs, Driggs was

11

shouting at himself, and Trujillo believed the same voices that were speaking to him were speaking to Driggs. The court noted the absence of any provocation; while Trujillo testified Driggs puffed out his chest as if getting ready to fight, he also testified he walked toward Driggs with the voices telling him to kill someone, and he was hoping Driggs would kill him because the voices would not stop. The court cited longstanding case law that when all the misperceptions of a person come from delusion, "then an imperfect self-defense does not lie."

**The Verdict**

The jury found Trujillo guilty of first degree murder and premeditated and deliberate attempted murder, and found the personal use of a deadly weapon allegation true as to both offenses. Trujillo was sentenced to 25 years to life on count 1 plus one year for the enhancement; and life in prison on count 2 plus one year for the enhancement, to run concurrently with the sentence on count 1.

Trujillo filed a notice of appeal that same day.

## DISCUSSION

### I. The Trial Court Did Not Abuse Its Discretion in Excluding Certain Evidence Regarding Trujillo's Mental Illness

Trujillo argues the trial court erred in excluding the following evidence bearing on his mental state at the time of the offense: (1) the history of his mental health and substance abuse problems; (2) expert opinions of how his mental health and substance abuse affected his mental state at the time of the offense; (3) certain extrajudicial statements he made; and (4) evidence of his mental health history, drug abuse, and extrajudicial statements to the experts after the prosecutor "opened the door" to such evidence. We disagree.

12

We review the trial court's decision to exclude evidence for abuse of discretion. (*People v. Cortes* (2011) 192 Cal.App.4th 873, 908 (*Cortes*).) This extends as well to the decision to admit or exclude expert testimony of a mental illness. (*People v. Pearson* (2013) 56 Cal.4th 393, 443.)[4]

## A.    Relevant Law

California has abolished the defense of diminished capacity. (§ 25.) Evidence of a person's mental illness may not be admitted to show or negate the *capacity* to form any mental state with which the accused committed a crime, but is admissible solely on the issue of whether or not the accused *actually* formed a required specific intent. (§ 28, subd. (a).)

In the guilt phase of a criminal trial, "an expert testifying about a defendant's mental illness, mental disorder, or mental defect shall not testify as to whether the defendant had or did not have the required mental states, which include, but are not limited to, purpose, intent, knowledge, or malice aforethought, for the crimes charged. The question as to whether the defendant did or did not have the required mental states shall be decided by the trier of fact." (§ 29.)

While section 28 allows the introduction of evidence of mental illness when relevant to whether a defendant actually formed a mental state that is an element of a charged offense, it does not permit an expert to offer an opinion on whether a defendant had the capacity to form a mental state *or* whether the

---

[4]     We conclude Trujillo's counsel adequately preserved his objections to the exclusion of evidence of his prior mental health and substance abuse, so do not need to address whether the issue is cognizable on appeal or whether counsel engaged in ineffective assistance by failing to do so.

defendant actually formed the mental state. (*Id.,* subd. (a).) But an expert's opinion that a form of mental illness could affect the defendant's mental state or impair his ability to form an intent, is relevant and admissible to whether the defendant actually harbored the requisite mental state. (*People v. Coddington* (2000) 23 Cal.4th 529, 582, overruled on other grounds in *Prince v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.) Thus, "[a]n expert's opinion that a form of mental illness can lead to impulsive behavior is relevant to the existence *vel non* of the mental states of premeditation and deliberation." (*Coddington, supra,* at pp. 582-583.) And an expert can testify "whether the defendant's conduct in committing the crimes was consistent with the expert's diagnosis of the defendant's mental condition." (*People v. Samayoa* (1997) 15 Cal.4th 795, 836.)

"[S]ection 29 does not simply forbid the use of certain words, it prohibits an expert from offering an opinion on the ultimate question of whether the defendant had or did not have a particular mental state at the time he acted. An expert may not evade the restrictions of section 29 by couching an opinion in words which are or would be taken as synonyms for the mental states involved." (*People v. Nunn* (1996) 50 Cal.App.4th 1357, 1364 (*Nunn*).) Thus, a party cannot evade the requirements of section 29 by saying a defendant did not " 'plan' " his actions, rather than saying he did not " 'premeditate' " or " 'deliberate.' " (*Ibid.*)

Most if not all the excluded evidence Trujillo challenges on appeal was excluded by the trial court not under section 28 or 29, but as irrelevant, as hearsay based on *Sanchez,* or under Evidence Code section 352. (*Sanchez, supra,* 63 Cal.4th at p. 685.) Under section 352, the court may exclude evidence in its discretion "if its probative value is substantially outweighed by

the probability that its admission will (a) necessitate undue consumption of time of (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) "A trial court's exercise of discretion will not be disturbed unless it appears that the resulting injury is sufficiently grave to manifest a miscarriage of justice." (*People v. Stewart* (1985) 171 Cal.App.3d 59, 65.)

## B. Exclusion of Trujillo's History of Mental Illness and Substance Abuse

Trujillo argues the trial court erred in concluding that his history of mental health and drug abuse problems—including the psychotropic medications he had previously been prescribed, the illicit drugs he had taken in the past, and the observations of his mother, friend, and treatment providers as to his mental condition—were all irrelevant and inadmissible under Evidence Code section 352.

As an initial matter, we note this description of what evidence was excluded is inaccurate. Trujillo quotes from various arguments and rulings made at different times, some of which were prior to trial before any testimony had been heard. At times, the trial court made more general statements from which it later retreated. Indeed, the court itself noted after argument on the motion in limine regarding sections 28 and 29: "Trials are fluid. I can make all these rulings and something can come up and you say Judge, I need to talk to you outside the presence. That's fine. I have no problem with overruling myself."

For example, Trujillo complains about a ruling at the outset of the case, in which the trial court stated it did not find the question of whether he suffered from auditory hallucinations his whole life "germane" unless it became so after cross-examination. Ultimately, Trujillo *was* questioned and allowed to answer

15

whether he had heard the auditory hallucinations prior to May 15, and said he heard them "[a]ll day every day."

Thus, whatever initial rulings the trial court made leading up to the defense's case, it ultimately allowed Trujillo to testify about the psychotropic medications he was taking; about all the illicit drugs he took on the day of the incident as well as in the years prior; that he had seen various doctors in hospital settings for mental health issues and been treated by multiple healthcare providers since 2017 (which was when he claimed his issues had begun), including a phone call made on the day of the incident; about his suicidal ideations on and before May 15; that he had been hearing voices on and before May 15 "[a]ll day every day"; and about the voices he heard on the day of the incident, including how he felt and reacted to the voices. The court also would have allowed Jovita to testify about her observations of him on the day of the incident, which defense counsel decided not to present.

When compared to the proffer, what the trial court excluded amounted to: (1) the specific reasons for each visit and hospitalization and the diagnoses given by prior doctors; (2) Jovita and his friend testifying about what Trujillo was like before his mental health issues began and their observations of him after his diagnosis; (3) Jovita testifying about taking him to various doctors after his mental health problems began; (4) Trujillo's work history; and (5) Trujillo's experiences while in jail after his arrest. We cannot see any error in these exclusions.

Trujillo cites *Cortes* to support his argument that the trial court abused its discretion in excluding this evidence. We do not find that case to support reversal. In *Cortes*, the trial court excluded all testimony from the defendant's expert about the defendant's own mental condition, and allowed the expert only to

16

testify about various conditions in general. (*Cortes*, *supra*, 192 Cal.App.4th p. 900.)

The Court of Appeal held the failure to allow the expert to testify about the defendant's actual mental illness or how such illness would affect the defendant's mental state violated sections 28 and 29: "No case has been cited to us, nor have we found one ourselves, which even remotely suggests that it is proper under sections 25, 28 and 29 to preclude *all* testimony about the accused's own diagnosis, or mental condition, at the time of the offense, but instead limit the expert's testimony to diagnoses or mental conditions 'in the population at large,' and 'their effects on a general person's behavior who might have that symptom.' " (*Cortes*, *supra*, 192 Cal.App.4th at p. 909.)

In *Cortes*, the defendant was 16 or 17 when he committed a murder. The trial court ruled the defendant's expert was not allowed to testify that he diagnosed the defendant as having an adjustment disorder with emotional and conduct problems or, given his history of prior emotional trauma and stress, with complex PTSD, an anxiety disorder, or a psychophysiological instability. (*Cortes*, *supra*, 192 Cal.App.4th at p. 897.) The expert was prevented from testifying that the PTSD was associated with an assault suffered by the defendant himself at the age of 13 or 14 by his mother's friend, which helped explain the dissociative state the defendant might have been in when he killed his victim. (*Ibid.*) The expert would also have testified the defendant's description of his behaviors when he was stabbing the victim (" 'I saw my hand coming down' ") were consistent with dissociation, a psychiatric response to stress particularly in persons with a history of victimization. (*Id.* at p. 895.)

It was in that context that the *Cortes* court held it to be an abuse of discretion not to allow the expert to testify about the

17

defendant's diagnosis and the traumatic experiences in the youth's life which informed the expert's diagnosis. (*Cortes, supra,* 192 Cal.App.4th at p. 909.)

Here, by contrast, the trial court did allow Trujillo's experts to testify regarding their diagnoses of Trujillo, both his possible schizophrenia/schizoaffective disorder and the substance abuse disorders, as well as the effect they could have on Trujillo. Trujillo and his experts were allowed to testify about both the prescription and the illicit drugs he took, and their possible effects on his mental state. Both Trujillo and his experts were allowed to testify in general terms that he had experienced mental health disorders since 2017 and had seen multiple doctors for his mental health and suicidal ideation. Unlike the defendant in *Cortes*, there were no specific incidents from Trujillo's childhood that arguably contributed to his current diagnosis; rather, the testimony here was that starting in 2017 he began to have mental health issues and, prior to the incident on May 15, 2020, had heard voices "[a]ll day every day."

Given the evidence that was allowed, the trial court's exclusion of detailed evidence as to every professional Trujillo saw was not error under Evidence Code section 352. The exclusion of the diagnoses made by previous nontestifying doctors was not error under *Sanchez*. (*Sanchez, supra,* 63 Cal.4th at p. 685.) The exclusion of evidence regarding Trujillo's work history and what he was like before he started hearing hallucinations as irrelevant or prejudicial, was not error as such evidence did not tend to "prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210; see also § 352.)

Nor was it error to exclude Trujillo's testimony about his experiences while in jail. The prosecution did not object and the

18

trial court allowed the experts to mention they had reviewed Trujillo's mental health records to date, and also what medications he was taking, as they could affect whether he correctly answered questions while in jail and thus related to his credibility. But the court excluded Trujillo's testimony that he was still having auditory hallucinations in jail as irrelevant and not "particularly probative" to what he experienced on May 15, 2020, again subject to being revisited in the future. We do not find any abuse of discretion.

First, unless Trujillo proposed to call a witness to testify about the diagnosis in jail, which does not appear in the argument, such evidence was case-specific hearsay under *Sanchez*, just like the other diagnoses in the medical records. (*Sanchez, supra,* 63 Cal.4th at p. 685.) Second, while Trujillo argues in his brief that evidence he continued to hear voices in jail after the incident and was placed on the psychiatric inpatient unit "was highly relevant to the jury's determination of what disorder Mr. Trujillo suffered from and how, if at all, that disorder impacted his mental state at the time of the stabbings," he gives no explanation of how so. It was not an abuse of discretion to exclude Trujillo from testifying about his continued hallucinations and how he was treated by jail officials after his arrest.

### C.     Exclusion of Expert Testimony

Much of the discussion in part I.B., *ante*, regarding the history of Trujillo's mental illness, overlaps with the issue regarding the evidence by Trujillo's experts that was excluded. We address here only any additional arguments not already covered above.

We conclude the trial court properly drew the line between preventing Trujillo's experts from testifying about what mental

state he actually had on the day of the incident and allowing them to testify about their diagnoses of Trujillo and about how drug use or those mental health diagnoses could affect individuals.

"It is difficult to clearly discuss mental states and psychological defense during the give and take of trial. In this case we believe the trial court's rulings and explanations were both correct and well stated." (*Nunn, supra*, 50 Cal.App.4th at p. 1365, fn. 4.) Specifically, we do not find that the prosecutor improperly claimed that the words "impulsive" or "overreacted" could not be used at all. Instead, the People's brief objected to Dr. Grand's opinion in her report that "Mr. Trujillo was experiencing psychotic symptoms that led to impulsive behavior due to drug and alcohol use and a misappraisal of the intentions of others." Dr. Grand's opinion did in fact run afoul of the prohibition that experts not testify about what mental state Trujillo actually had. Thus the argument that the experts could not use words like "overreacted," "impulsive," "did not plan," or "his ability to deliberate was likely impaired" was specifically tethered to the prosecution's argument that the experts could not use such words to describe Trujillo's actual mental state. This was an accurate statement of the law.

Trujillo also objects that the trial court "barred the defense from presenting the facts and information the experts relied upon in reaching their conclusions." But the trial court was expressly asked to exclude such underlying nontestifying experts' diagnoses under *Sanchez*. This was appropriate. Under *Sanchez*, an expert providing the basis for his opinion may provide his general knowledge in the relevant field of expertise, even if it is technically hearsay. However, an expert may not supply "case-specific facts about which he has no personal knowledge."

20

(*Sanchez, supra,* 63 Cal.4th at p. 676.) Thus, "[a]ny expert may still *rely* on hearsay in forming an opinion, and may tell the jury *in general terms* that he did so. . . . [¶] What an expert *cannot* do is relate as true case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or are covered by a hearsay exception." (*Id.* at p. 686.)[5]

In sum, the trial court correctly allowed Trujillo's experts to testify they had relied upon certain reports of nontestifying witnesses, but would have erred had it allowed the experts to testify about their contents. (*People v. Campos* (1995) 32 Cal.App.4th 304, 308.)

### D.     Exclusion of Trujillo's Extrajudicial Statements

Trujillo claims it was an abuse of discretion for the trial court to exclude Jovita's testimony about out-of-court statements Trujillo made to her about hearing voices and having auditory hallucinations on the ground they were hearsay. We disagree. The trial court was correct in ruling the fact he "complained" to Jovita for years may not have been hearsay, but if she were to testify he complained to her for years about hearing voices, that testimony would be "to prove the truth of the matter stated," i.e., that he was hearing voices. (Evid. Code, § 1200, subd. (a).)

---

[5]     Although Trujillo complains the jury would have been justified in disregarding the expert's seemingly baseless opinions, this is a concern the Supreme Court in *Sanchez* was fully aware of when it made its ruling: "It may be true that merely telling the jury the expert relied on additional kinds of information that the expert only generally describes may do less to bolster the weight of the opinion." (*Sanchez, supra,* 63 Cal.4th at p. 686.) It answered the concern by noting the expert could tell the jury it was relying on facts, and the constitutional mandates of the confrontation clause. (*Ibid.*)

Trujillo argues the testimony was not offered for the truth of the matter asserted—that he was hearing delusions—but to show he had been mentally ill for a long time and his mother had repeatedly sought out treatment to no avail. First, that Trujillo had sought out treatment to no avail, although sympathetic, was irrelevant to the guilt phase of a criminal trial. But second, the statements could only be relevant to his mental health if they were understood to mean that he actually *was* hearing voices—again, for the truth. After all, there was no relevance to the testimony said if the statements were untrue—such as a person lying or joking about "hearing voices." When an out-of-court statement is only relevant if it is understood to be true, the testimony is hearsay. (*People v. Portillo* (2023) 91 Cal.App.5th 577, 590.)

### E. Exclusion of Evidence on Rebuttal

Trujillo argues the trial court erred when it concluded the prosecutor had not opened the door to further testimony about Trujillo's mental health history from his mother and friend after a witness for the defense testified he did not observe Mr. Trujillo to be talking to himself or to be under the influence of alcohol. The court instead reiterated its ruling that Trujillo's general history of mental health issues could be elicited, but not the details of each doctor visit and each drug ingested.

Deputy Michael Thompson testified for the prosecution that when he stopped Trujillo and arrested him, Trujillo responded to his directions, his speech seemed normal, he did not appear to be under the influence of alcohol or any drug, and he did not appear to be having a mental health issue. Similarly, Trujillo appeared to understand instructions and was not speaking to himself or mumbling incoherently when he was booked. Deputy Thompson testified on cross-examination he had never done a DUI

investigation involving a combination of methamphetamine and alcohol, conducted no field sobriety tests, and had no training in the area of substance abuse or as a mental health professional.

The trial court did not abuse its discretion in hewing to its prior line as to what would be excluded. Both before and after Deputy Thompson testified, the court ruled Trujillo's mental health and substance use on May 15, 2020 were relevant, and the trial court let in all requested testimony about that day. The court also allowed testimony about Trujillo's prior drug use and about how he had had auditory hallucinations for many years, the frequency with which he had them, and the specific medical providers he had seen over the years, with the dates. Dr. Grand also testified without objection that a person experiencing auditory hallucinations might restrain the urge to respond and respond in their heads without saying anything out loud.

Thus, the additional information Trujillo points to—the specific diagnoses of mental health providers prior or subsequent to the murder—would have involved his experts or Jovita testifying about hearsay. We cannot find the evidentiary ruling was arbitrary or capricious. (*People v. Johnson* (2022) 12 Cal.5th 544, 611.)

In a similar vein, Trujillo argues the prosecutor opened the door to further evidence of his history of mental illness and drug abuse by cross-examining Trujillo regarding whether the conversation he had with the voices on May 15 was similar to the "normal kind of conversation that you normally have with the voices?" Nothing in this short portion of Trujillo's cross-examination alters our conclusion the trial court properly allowed considerable evidence of his mental health issues, while disallowing detailed information regarding visits to his providers under Evidence Code section 352 and as hearsay.

Finally, Trujillo argues the trial court abused its discretion in permitting the prosecution to elicit Drs. Grand's and King's opinions that they doubted the veracity of Mr. Trujillo's "self reporting" without allowing Trujillo to explore the bases for these opinions. After that testimony was elicited during cross-examination of Dr. King, defense counsel argued at a side bar that he should "be able to ask [Dr. King] about what the self reporting was, what the information [Trujillo] provided him was and those details, and what if anything he found to be incorrect or untrue or that he had doubts as to the v[e]racity." The trial court responded that counsel could follow up as to whether the inconsistencies were material or not, but "we aren't going into the actual statements because they don't matter."

This ruling is harder to parse. Trujillo was entitled to inquire into the questions raised during cross-examination as to why Dr. King questioned the veracity of his self-reporting. Nonetheless, the trial court retains broad discretion as to the extent of redirect. (*People v. Hamilton* (2009) 45 Cal.4th 863, 921.) If the question had been phrased in an open fashion, such as "why did you doubt the veracity of his self-reporting?," it would undoubtedly have been relevant. Instead, defense counsel sought leave to ask about all the statements Trujillo made to Dr. King during his various interviews as noted in the expert reports, something the trial court was not willing to allow. It was not an abuse of discretion for the trial court to rule that the question on cross-examination did not open up the defense to be able to ask about *all* the statements that Trujillo made to his own expert.

However, even assuming this ruling was error, it was harmless. Whether the jury believed Trujillo's experts' diagnoses as to his mental state, or believed he was fully sober and without delusion on the day in question, the evidence about intent was

24

overwhelming. Trujillo admitted he intended to kill both victims and his only argument as to self-defense was based on delusion. (See pt. II., *post.*) Whether evaluated under *Chapman v. California* (1967) 386 U.S. 18, 24 (beyond a reasonable doubt standard), or *People v. Watson* (1956) 46 Cal.2d 818, 836 (reasonably probable standard), any error in failing to allow redirect on this issue was harmless.

## II.     The Trial Court Did Not Err in Refusing to Give a Jury Instruction on Imperfect Self-defense

Under the doctrine of imperfect self-defense, " '[i]f a person kills . . . in the unreasonable but good faith belief in having to act in self-defense, the belief negates what would otherwise be malice, and that person is guilty of voluntary manslaughter . . . , not murder.' " (*People v. Schuller* (2023) 15 Cal.5th 237, 243 (*Schuller*).)

On appeal, "[w]e review de novo a trial court's decision not to give an imperfect self-defense instruction." (*People v. Simon* (2016) 1 Cal.5th 98, 133.) "A defendant charged with murder is entitled to an instruction on imperfect self-defense when there is substantial evidence to support the theory." (*Schuller, supra*, 15 Cal.5th at p. 243.) Substantial evidence is " 'evidence sufficient to "deserve consideration by the jury," that is, evidence that a reasonable jury could find persuasive.' " (*Simon, supra,* at p. 132.) "Speculative, minimal, or insubstantial evidence is insufficient to require an instruction on a lesser included offense." (*Ibid.*)

Imperfect self-defense is not available if it is premised "solely on delusion." (*People v. Elmore* (2014) 59 Cal.4th 121, 145 ["A claim of self-defense based solely on delusion is . . . a claim of legal insanity."]; see *People v. Mejia-Lenares* (2006) 135 Cal.App.4th 1437, 1453–1454 ["[a] person acting under a

delusion is not negligently interpreting actual facts" as required for imperfect self-defense].)

Here, the evidence was clear the claim of self-defense was based solely on Trujillo's self-reported delusions.[6] His own expert's report concluded "Trujillo was experiencing psychotic symptoms that le[d] . . . him to impulsive behavior due to drug and alcohol use and a misappraisal of the intentions of others. He believed he was acting in self-defense."

Trujillo argues there were objective circumstances from which a jury could have inferred he acted in a mistaken belief that he needed to act in self-defense, citing his testimony Driggs was yelling when Trujillo came upon him, assumed a fighting position, and Trujillo thought Driggs was going to attack him.

This is a mischaracterization of Trujillo's testimony. When Trujillo first saw Driggs, Driggs was "yelling to nobody." Trujillo walked approximately 46 feet over to Driggs, at which point Driggs "turn[ed] on [him]," stopped yelling, and pushed his chest out. Trujillo "assum[ed] that [Driggs] thinks I'm going to kill him and he's gonna fight me. So I pull out my knife." Trujillo admitted Driggs had not been yelling or talking to him, and Driggs did not provoke him in any way. Trujillo admitted he stabbed Driggs "with the intention to kill him"—an intent formed *before* he got to him and started stabbing him. In sum, all that Trujillo described was that *Driggs* was acting in self-defense. There was no error.

---

[6]    Trujillo's expert Dr. Grand testified Trujillo was legally sane, and Trujillo does not claim this case should have been tried as a case for not guilty by reason of insanity.

## III. Trujillo Did Not Demonstrate His Counsel Rendered Ineffective Assistance

Finally, Trujillo argues his counsel rendered him ineffective assistance because counsel failed to impeach Trujillo with his prior inconsistent statements, made to his own expert witnesses, that Driggs had run at him and that Trujillo had acted in self-defense.

A criminal defendant has a right to effective assistance of counsel at trial. (*Strickland v. Washington* (1984) 466 U.S. 668, 684, 686; *People v. Ledesma* (2006) 39 Cal.4th 641, 745–746.) "In order to establish a claim of ineffective assistance of counsel, [the] defendant bears the burden of demonstrating, first, that counsel's performance was deficient because it 'fell below an objective standard of reasonableness . . . under prevailing professional norms.' " (*Ledesma, supra*, at pp. 745–746.) "[U]nless the record reflects the reason for counsel's actions or omissions, or precludes the possibility of a satisfactory explanation, we must reject a claim of ineffective assistance raised on appeal." (*Id.* at p. 746.)

Trujillo has not shown counsel's performance was deficient. The statements in question are as follows. In Dr. Grand's 2021 report, she indicated Trujillo told her he thought he was going to be attacked first, so he acted in self-defense. In her 2023 report, she indicated Trujillo told her "the second victim was a 'crazy man' who was yelling and screaming, running at him, and he was scared." Finally, in Dr. King's 2023 report, he reported that Trujillo "said he perceived the second victim as a threat. The victim was reportedly yelling at someone when he 'turned his attention toward me and came toward me. I thought he was going to kill me.' "

27

Assuming without deciding that Trujillo's own statements to his experts could escape being excluded as hearsay by being cast as prior inconsistent statements under Evidence Code section 1235, we find no ineffective assistance. Counsel reasonably could have determined that introducing these contrary statements would do more harm than good by attacking Trujillo's own credibility. After all, Trujillo himself testified under oath, in front of the jury, that he was the one who walked over to Driggs; he formed the intent to kill Driggs beforehand; Driggs did not provoke him; and Trujillo assumed Driggs thought Trujillo was going to attack him. With that testimony, it was reasonable for defense counsel not to hope the jury would believe what Trujillo said to his own expert witnesses rather than what he said to them in open court. Given that Trujillo was the only witness who could—and did—testify about the crucial issue of his state of mind on the day of the killings, counsel would have acted reasonably in not pointing out his inconsistent statements.

## DISPOSITION

The judgment is affirmed.


RICHARDSON, J.

WE CONCUR:



LUI, P. J.



CHAVEZ, J.

28